### STANDIFORD et ux. v. THOMPSON.

(Circuit Court of Appeals, Fourth Circuit. February 21, 1905.)

#### No. 549.

1. VENDOR AND PURCHASER—CONSTRUCTION OF INSTRUMENT—CONTRACT OF SALE OR OPTION.

   Where an instrument purporting by its terms to be a contract for the sale of the coal underlying certain land was signed only by the owner of the land, and was thereafter referred to in all communications between the parties and in assignments of the instrument, and treated by all parties connected with the matter, as an option only, it will be so construed.

2. SPECIFIC PERFORMANCE—CONTRACT ENFORCEABLE—OPTION TO PURCHASE COAL LANDS.

   Defendant, who was the owner of land underlaid with coal, executed a paper by which he agreed to sell the coal to one R. It provided that unless a first payment should be made by a date named, or as soon thereafter as the title should be examined and accepted, the agreement should be considered as rescinded. R. was acting as a broker in obtaining op-

tions for a company which sent defendant a written acceptance of the option, but did not make any payment at the time stipulated, nor when the abstract had been approved, and subsequently became insolvent and abandoned the purchase. About 18 months after the agreement, R. obtained an extension agreement signed by himself and defendant, but not under seal, by which the time was extended to a day fixed, and R. agreed that, if payment was not made by such time, he would surrender the "option" and all other papers. Such payment was not made, but several months thereafter R. transferred his rights to complainant, who demanded a conveyance, which was refused. *Held*, that the agreement was merely an option, and time was of its essence, not only by its terms, but in view of the nature of the property, and that, under the facts shown, a court of equity would not decree its specific performance by defendant after the property had increased in value.

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Wheeling.

Nelson C. Hubbard (Hubbard & Hubbard and W. A. Hook, on the brief), for appellants.
William H. Hearne, for appellee.

Before PRITCHARD, Circuit Judge, and BRAWLEY and WADDILL, District Judges.

BRAWLEY, District Judge. This is an appeal from the Circuit Court of the United States for the Northern District of West Virginia, from an order and decree in a cause wherein the above-named appellants were defendants, and appellee plaintiff, in which the court adjudged "that the plaintiff Josiah V. Thompson is entitled to the specific performance of a contract dated the 11th day of January, 1900, for the sale of certain coal underlying the lands of said John Standiford, in the bill and proceedings mentioned, which contract was made by the said John Standiford to C. V. Riley, and by the said C. V. Riley transferred and assigned to the plaintiff herein."

Standiford and his wife, who will be hereafter referred to as the defendants, owned in fee simple a tract of land situated in Marshall county, W. Va., containing about 253 acres, underlaid with bituminous coal; and on January 11, 1900, he entered into an agreement with C. V. Riley whereby he agreed to sell and convey to said Riley, his heirs and assigns, all the underlying coal in and under the tract of land therein described, for which Riley agreed to pay $12 per acre for each and every acre, as follows: 25 per cent. in cash, and balance in three equal annual payments. He further agreed to furnish a complete abstract of title, and a general warranty deed, clear of all incumbrances, when the first payment was made, and the other secured by mortgage. The concluding words of this agreement are:

"It is expressly understood and agreed that if the first payment aforesaid is not made on or before the first day of October, 1900, or as soon thereafter as the title shall be examined and accepted by the party of the second part [Riley] or his heirs or assigns, this agreement shall be considered as rescinded and no party shall be bound thereby."

Standiford was a farmer residing in that county, and it appears that C. V. Riley was by occupation a farmer, but engaged also in the coal business and the selling of coal lands; and it appears that he and one

McCombs were engaged in getting options upon coal lands in that section, in the interest of the Viola Coal Company, and that he obtained options on about 34 tracts of land for that purpose. On September 25, 1900, the Viola Coal Company sent to Standiford a written acceptance, service of which was acknowledged on that day, of which the following is a copy:

"We hereby accept under an agreement made for our benefit the option granted by you to C. V. Riley on the 11th day of January, 1900, of all the coal underlying your property, said to contain 253 acres, the same as set forth, in the option above mentioned. Our corps of engineers will survey your property to ascertain the acreage, and we will at once inform you as to the result and furnish a plat of the same, by which you can ascertain the accuracy and correctness of the survey. You will please prepare an abstract of your title that the same may be examined and approved by our attorneys."

Standiford furnished an abstract of his title to the firm of Riley & Ritz, of which firm T. S. Riley, a brother of C. V. Riley, was a partner.

The Viola Coal Company was a corporation of $50,000 capital, of which $5,000 was paid in, and it contemplated the building of a railroad through these lands, but nothing seems to have been done in furtherance of this purpose. It was stated at the hearing that it was insolvent, and the bill of complaint charges that "the said Viola Coal Company, for some cause or reason unknown to your orator, did wholly fail to complete and carry out its said contract for the purchase of the said coal and coal rights and privileges made with the said C. V. Riley as aforesaid"; and there was a meeting of the farmers who had given options to Riley about the middle of June, 1901, at which Riley was present. One of the parties at the meeting says:

"The meeting was called to consider what they would do. Mr. Riley had promised them their money, you know; and they wanted to see whether the Viola Coal Company was gone, and what had become of them. Riley had this extension paper, and he read that; and then he stated that he would give the farmers their money against the 1st of October, or surrender the paper, as free as he would set down and eat a meal."

The extension paper referred to is as follows:

"This agreement made this 26 day of June, A. D., 1901, between C. V. Riley of the first part and the undersigned parties who heretofore gave options on their coal to the first party of the second part: whereas, the first party now holds options upon the coal of the second parties, and under said options surveys have been made of what is known as the Viola Block, in Webster and Sand Hill Districts, and the said first party desiring further time to complete the sale of said block; it is, therefore, agreed between the first and second parties hereto that in consideration of the second parties extending the time until the first day of October, 1901, the first party agrees that if he or his assignees are not ready to make payment as provided by the options on the last mentioned date, that he will surrender to the second parties said options, and all papers in his possession connected therewith, and release the second parties from all claim and damages by reason of such options."

This paper was signed by C. V. Riley and by John Standiford and seven or eight others. When the 1st of October had passed, and Riley had failed to carry out his agreement, or surrendered the options as agreed, other meetings of the farmers interested were held, at one of which a committee was appointed to consult a lawyer as to whether

they were still bound by their agreements; and this committee consulted Mr. Holt, an attorney of Moundsville, who, in a written opinion, advised them that the options had expired. Some time during the autumn, T. S. Riley, the brother of C. V. Riley, and attorney for him and McCombs, had negotiations with the plaintiff, who resided at Uniontown, Pa.; and on September 27th plaintiff agreed, in a message over the telephone, to take some of the tracts of land on which these parties had options, leaving out about 1,000 or 1,500 acres of the lands lying on the south, which did not bound on his lands. These negotiations culminated in a written agreement of date February 14, 1902, accepted by plaintiff February 21, 1902, whereby he agreed to accept the coal on a subjoined list, aggregating something over 3,000 acres; "settlements and payments to commence in June, 1902." Standiford's name appears last on this list, but the list did not embrace all the tracts on which Riley and McCombs had options; there being, as stated above, about 1,000 or 1,500 acres which he declined to take. Another meeting of the farmers was held November 11th, at which J. M. Ritz, the law partner of T. S. Riley, and representing Thompson, the purchaser, was present.

One of the witnesses who attended this meeting testifies that Ritz "went on to tell them that the coal was sold, and wanted the people to wait for a test well, and stated that the coal was sold subject to the test; and we people would talk in and interrupt him, you know, about telling him that coal was not sold at all, and then he would go ahead and say, 'Oh, yes, it was sold;' and he says, 'If it did not prove satisfactory, we ain't going to ask the party to take the coal;'" and again he said that he had "sold the coal, provided the test well proved out satisfactory, 'and, if it did not,' he said, 'I ain't going to ask the man to take it.'" This same witness, who was one of the parties who had given an option to Riley, says that shortly thereafter he went to Hearn, the attorney for Thompson, carrying with him his abstract of title and deed, and inquired if Thompson was going to take his coal. Hearn told him that his name was not on the list, but perhaps he might hear from him later; and it appears from the testimony that Hearn, as Thompson's attorney, had begun some time about the end of October to pay for some of the lands which Thompson had agreed to buy. The test well was drilled and completed some time in January, and, as already stated, Thompson on February 21, 1902, agreed with McCombs and Riley to accept the coal covered by their options, the list of which was attached to the agreement. Meantime Standiford, acting on the advice of the lawyer consulted by the committee above referred to, and believing himself free to do so, gave an option on his coal in his coal lands to W. H. Hook, January 8, 1902, at $15 per acre; and on March 8, 1902, C. V. Riley sent a notice to Standiford to present his abstract and deed to W. H. Hearne, Esq., attorney for J. V. Thompson, at his office, at Wheeling, W. Va., as soon as convenient, so that they can be examined and passed upon by him, and that his coal would be "taken up and paid for under the terms of your option to me dated 11th day of January, 1900, and extension thereof." The record shows that on September 28, 1900, there was "an agreement between Charles V. Riley and Edgar A. Holmes, acting for and in behalf of the Viola Coal Com-

pany," reciting that Riley being the "owner of certain options aggregating about 2,800 acres in coal lands," etc., "and is desirous of selling the same to the Viola Coal Company, Holmes, acting in behalf of that company, engages to purchase the same at a fixed price of $15.00 per acre." It further shows that on October 9, 1901, the Viola Coal Company disclaims and renounces any and all interest in and claim to the coal properties or options referred to in the list annexed, and transfers and assigns unto Charles V. Riley all right, title, and interest in and to said property and options. This assignment is signed, "Viola Coal Company, Floyd K. Smith, Secretary." It has not the seal of the company, and there is nothing in the record showing that Smith was secretary. All of these agreements, with the agreement of January 11, 1900, and that of June 26, 1901, are indorsed, "For value received, I hereby transfer and assign the within agreement [or contract] to J. V. Thompson. [Signed] C. V. Riley," no date appearing on the assignments.

The only other paper in the record that seems to be necessary to a full understanding of the facts in the cause is the letter which appears to have been sent from the law office of T. S. Riley, Wheeling, W. Va., April 30, 1901, addressed to John Standiford, and signed by J. M. Ritz, which says: "Dear Sir: Your abstract has been finished and is now ready for the typewriter. I have gone back with the title to the patent or Commonwealth. Very truly yours."

The main question to be determined is the nature of the agreement of January 11, 1900. This agreement, although in its recitals professing to be bipartite, is signed only by Standiford. Riley, the party to whom it was given, calls it an "option," and the paper in evidence is indorsed, "Coal option," and all through his testimony in the cause it is referred to as an option. In the agreement between Riley and Holmes, acting for the Viola Coal Company, it is called an "option," and the Viola Coal Company, in its notice to Standiford of date September 25, 1900, says: "We hereby accept under an agreement made for our benefit the option granted by you to C. V. Riley on the 11th day of January, 1900," etc. The agreement of June 26, 1901, between Riley, Standiford, and others, refers to this and like papers as options; and in his letter to Standiford of March 8, 1902, which is the first and only written notice of the sale to Thompson, Riley speaks of it as "your option to me dated on the 11th day of January, 1900." All the witnesses, including T. S. Riley, the lawyer, and his partner, Ritz, and W. H. Hearne, the counsel for the appellee, refer to this and like papers as options. The agreement between McCombs and Riley of February 14, 1902, which is a part of plaintiff's chain of title, assigns "the options covering the coal land," and Standiford's name appears on the "list of options," which was a part of that agreement.

Although the rule undoubtedly is that an instrument in writing must be construed according to its terms, and not by what people call it, the contemporaneous interpretation, and the practical construction put upon its language by both parties and by all persons familiar with the subject-matter, should be considered in solving any doubts which may arise in construing the words in which the parties have attempted to clothe their intentions; and there is no doubt

whatever, from the testimony, that Standiford intended to give Riley an option upon his coal lands, and nothing more. An option has been defined to be "an unaccepted offer to sell." It transfers no title or right in rem, but creates a right in personam, and that right is to accept or reject a present offer within a limited or reasonable time in the future. It is a continuing offer until the expiration of the time limited, and we are of opinion that, in the circumstances proved in this case, it was Standiford's intention to confer upon Riley an agency for the sale of the lands mentioned, at a named price, for a named period, and it was expressly agreed that the first payment was to be made on or before October 1, 1900, "or as soon thereafter as the title shall be examined and accepted." This last clause undoubtedly gave Riley some time after October 1, 1900, for the examination of the title, and to that extent is somewhat indefinite, but the time to be given for that purpose should be construed to be a reasonable time; and it appears from the testimony that Standiford did furnish to Riley's attorneys all the papers necessary for the preparation of an abstract of title, and by the letter of April 30, 1901, it further appears that the attorneys had finished the abstract before that date, and had gone back with the title to the patent or Commonwealth, and no fault or question was made as to the title. When, therefore, the Viola Coal Company, in whose interest the option was taken, on September 25, 1901, five days before the expiration of the time limited, gave notice to Standiford that they accepted the terms proposed, they did not perfect any title simply by exercising their right of acceptance, but the same should have been fully completed by payment within the time limited, or a reasonable time thereafter. But it is contended that this paper of January 11th was not an option, but an agreement of sale. How did Riley regard it? There can be no sale without a purchaser, and Riley surely did not regard himself as a purchaser, nor did he so regard the Viola Coal Company, to whom he assigned all of his rights under the agreement, for we find that in June following, apparently upon the assumption that the Viola Company was insolvent and had no intention of completing the transaction, Riley obtains from Standiford the agreement of June 26, 1901, for the avowed purpose of getting "further time to complete the sale of said block." His whole attitude is that of a broker, who, for the purpose of making commissions for himself, obtains an option for a limited period of these coal lands, which he expects to sell to the Viola Coal Company. When the time fixed in the option had expired, and the Viola Company had lost or abandoned any rights which it could claim under the agreement of January 11th, Riley, still desirous of making his commissions, obtains from Standiford another option, and straightway seeks to find another purchaser. The second option differs from the first in this: That by its terms the time in which to complete the sale is limited to October 1, 1901, and, in consideration of such extension, he expressly agrees that, if he or his assignees are not ready to make payment on the last-mentioned date, he will surrender all the papers in his possession. There is no provision in the second option for any time after October 1st for the examination of the titles—partly, it may be assumed, because the

owners of the land, who had been waiting about 18 months to sell their coal, were not willing to continue indefinitely to allow the cloud to hang over their titles, and partly because there was no longer any question as to Standiford's title, for it had already been examined and approved, and was then in the possession of Riley's brother and counsel, who was present when the agreement of June 26, 1901, was made.

The only view upon which plaintiff's cause can be sustained is that the agreement of January 11, 1900, was not an option, but a contract for the sale of the land upon a condition subsequent, vesting a title in the land at once in the purchaser, subject to be defeated on the nonpayment of the money upon the day specified. Could Riley be held as a purchaser under such agreement? Clearly not, for he did not sign it, and there was no time from the beginning of these transactions to the end when Standiford could have compelled him to take the land. The doctrine of the specific performance of contracts for the sale of lands mainly depends upon the principle that, when such agreement is made, the purchaser becomes the equitable owner, and a trust is impressed upon the legal estate for his benefit. The beneficial and substantial ownership of the estate is in the vendee, and the equitable ownership of the purchase fund is in the vendor. Equity will therefore enforce the performance of such a contract properly concluded between the parties, if, for sufficient reasons, one of the parties fails to keep the exact date assigned by the contract for its completion, if it can do justice between them, and there is nothing in the express stipulations, or in the nature of the property, or in the surrounding circumstances, which indicates that time was not regarded by the parties as a material element, and the payment of interest on the deferred payment would be full compensation to the vendor for the delay. The ground of relief is that the equitable title being in the vendee, liable to be defeated by failure to comply with a nonessential part of the agreement, equity, which abhors penalties and forfeitures, will in any proper case grant relief where the party asking it has lost his right to a legal remedy by omission to comply with the provisions in respect to the time of performance. In such cases, and in such cases only, can it be properly said that equity does not regard time as of the essence of a contract; but in equity, as at law, the intention of the parties should govern, and if it plainly appears that it was the intention of the parties that no rights should vest until some act was done, and the time for the doing of the prescribed act is definitely specified, a court of equity has no power to make a new contract for the parties, and to confer upon one of them rights which by the terms of the contract did not exist. It cannot disregard the intention of the parties where it is embodied in an express stipulation, and especially is this true where the essential element of time inheres in the nature of the subject-matter. As was said by Justice Story in Taylor v. Longworth, 14 Pet. 172, 10 L. Ed. 405—a case where specific performance was decreed:

"There is no doubt that time may be of the essence of a contract for the sale of property. It may be made so by the express stipulation of the par-

ties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or purchaser."

If the subject of the contract is one likely to be of greater or less value, according to the effluxion of time, and a definite time is fixed therein for its performance, there is a necessary implication that time was of the essence of the contract relating to it. As said by the court in Waterman v. Banks, 144 U. S. 403, 12 Sup. Ct. 646, 36 L. Ed. 479:

"This principle is peculiarly applicable where the property is of such character that it will likely undergo sudden, frequent, or great fluctuations in value. In respect to mineral property, it has been said that it requires, and of all properties, perhaps, the most requires, the parties interested in it to be vigilant and active in asserting their rights."

Pomeroy on Specific Performance of Contracts, § 387, states the principle thus:

"In respect to unilateral contracts there is some discrepancy among the authorities. One group of decisions holds that, with respect to them, time is, and necessarily must be, essential, in the strict sense of the term, while another group holds that time is merely material, and not essential. This conflict may perhaps be reconciled by a suggestion drawn from the form and provisions of the contracts themselves. Where the contract is really an offer on one side, with a provision that this offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified day, then, of course, the act of assent or of payment must be done within the prescribed time; and time is, from the very form of the contract, essential. If, therefore, a vendor agrees to convey if payment be made at or before the given date, or if an option is given which is to be accepted by payment within a given time, then the time of the payment is certainly essential. In fact, payment is a condition precedent to the vesting of any right in the vendee."

And after a review of the authorities pro and con, from all of which it appears that the subject-matter of the contract is always considered a material circumstance in construing it, he says, in section 390:

"It is now thoroughly established that the intention of the parties must govern, and, if the intention clearly and unequivocally appears from the contract by means of some express stipulation that time shall be essential, then the time of completion or of performance, or of complying with the terms, will be regarded as essential in equity, as much as at law. No particular form of stipulation is necessary, but any clause will have the effect which clearly and absolutely provides that the contract is to be void if the fulfillment is not within the time prescribed."

In Richardson v. Hardwick, 106 U. S. 254, 27 L. Ed. 145, the court, in construing a case where a specific performance was refused, says:

"The written contract gives him the privilege, or as counsel call it, an 'option,' to become equally interested in the lands by paying one-half the purchase money, etc., within two years after its date. The contract of itself did not vest him with any interest or estate in the lands. It merely pointed out the mode in which he might acquire interest, namely, by paying a certain sum of money before a certain time. He did not pay the money within the time limited by the contract. * * * It is clear from the terms of the contract that Richardson was not bound by it. He did not agree to purchase any share in the lands, or to pay Hardwick any money. The contract gave Hardwick no cause of action against Richardson. The latter was not bound to become interested in the lands, or to pay any money thereon, unless he chose to do so. In suits upon unilateral contracts, it is only where the

defendant has had the benefit of the consideration for which he bargained that he can be held bound."

Here we are asked to enforce a contract relating to coal, which in its nature was subject to great changes and fluctuations in value. No fault or laches is imputable to the defendant, for he did all that was required by the terms of the agreement, in furnishing to Riley's attorneys an abstract of title. After waiting about 18 months he gave to Riley, without consideration (for the second extension is not under seal, which might import consideration), an extension of time to October 1, 1901, upon Riley's express agreement to surrender all papers, etc., if the first payment was not made by that date. He then finds that Riley is negotiating with a new purchaser, the plaintiff herein, whose attorney appears at a meeting of farmers who had given like options, and informs them that this contemplated purchaser intends sinking a test well, and, if he finds it satisfactory he will take the lands, otherwise not. This is a condition not referred to or hinted at in the agreement of January 11, 1900. Standiford thus remains in a condition of doubt and uncertainty for a long period of time. He has no contract which he can enforce against anybody. The Viola Company, the only party that was ever in any way bound to him, had abandoned all claims; having, as stated in the bill of complaint, "wholly failed to perform its contract." It was defunct, and Riley, who had represented it in taking the option of June, 1901, had so far supplanted the former agreement that no acceptance under the former by the Viola Company could operate to affect the like option as between Standiford and Riley. Riley confessedly was not bound. He had never agreed to purchase for himself. He was a mere broker, having no title in himself to these lands, but was endeavoring to find a purchaser and thereby secure his commissions. In these circumstances, the defendant and others in like plight took legal advice, and, being assured that he was free from any obligation, had bargained to sell to another. Happily for him, the delay on the part of Riley to find a purchaser who would comply with the terms of the agreement has turned to his advantage, for the price of coal lands was enhanced. Had it been otherwise, and the value had diminished, as it was liable to do, does any one believe that plaintiff would have sought to enforce specific performance? A contract which binds one party for an indefinite period of time, leaving the other party entirely free, is lacking in mutuality. If there was a completed contract, founded upon sufficient consideration, the doctrine of mutuality might be ignored, but here there is no contract which Standiford could have enforced against Riley. The only party who ever became bound was, the Viola Company, which, by its acceptance of the option September 25, 1900, could have compelled Standiford to carry out his agreement if it had proffered payment within a reasonable time; but the time fixed in the agreement for payment being October 1, 1900, or as soon thereafter as the titles shall be examined and accepted, any delay on its part in making payment after Standiford had furnished his abstract would be unreasonable, and the testimony shows that Standiford furnished his abstract and the title was examined early in the year 1900. By that time it was apparent that, by reason of insolvency or otherwise, the Viola Company had abandoned all interest in the coal lands,

Neither Riley nor his assignee, the plaintiff here, ever undertook to assume the obligation which was upon the Viola Company by reason of its acceptance; and both Riley and the Viola Company, for whose benefit the agreement was obtained, gave to it the name and character of an option, which required acceptance to make it a completed contract. Neither of them considered it a purchase agreement which would be complete without acceptance. If there is any equitable estate growing out of the agreement, it would be in the Viola Company; and, if such estate is not altogether forfeited and abandoned by reason of its failure for more than a year, without explanation or excuse, to pay for the lands as it agreed to do, it is doubtful whether the paper purporting to be signed by the secretary of the Viola Company in October, 1901, could be considered an instrument which would divest its title, for this paper has not attached to it the seal of the company, and there is no evidence that the company authorized it; but, inasmuch as there is nothing in the decree below which indicates that the judgment appealed from is predicated upon any title derived from the Viola Company, that question need not be further considered.

We are of opinion that the agreement of January 11, 1900, was considered by all the parties to it as an option, and nothing more; that to interpret it as an agreement of sale to Riley, which vested an equitable title in him, would be to make a contract which the parties themselves did not make; that there was not that meeting of minds which must lie at the base of every enforceable contract. The judgment of the court below, therefore, is reversed, and the cause remanded, with instructions to dismiss the bill.

Reversed.