## SHUBERT THEATRICAL CO. v. RATH et al.

(Circuit Court of Appeals, Second Circuit. February 16, 1921.)

### No. 170.

1. **Injunction ⬤⇒60—Granted to enforce negative covenant in contract for personal services.**

    While a court of equity will not decree specific performance of a contract for personal services, it has power to enforce by injunction a negative covenant in the contract that the services contracted for shall not be rendered to another during the contract term, and will do so where the services are unique and extraordinary and cannot be purchased from others, and damages for breach of the contract cannot, therefore, be measured with certainty.

2. **Contracts ⬤⇒22(1)—Operation of "option" contract stated.**

    An "option," when based on a sufficient consideration, is a contract by which one party binds himself to sell property or perform services, and leaves it discretionary with the other to take the property or accept the services on the terms specified, and in such a contract there are two elements: First, the offer to sell or to render the services, which does not

become a contract until accepted; and, second, the completed contract to continue the offer, or leave it open for the time named.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Option.]

**3. Contracts ⊕⟹22(1)—Generally mailing letter effective exercise of option.**

If an option contract either expressly or impliedly authorizes acceptance of the offer by letter, the due mailing of such a letter is an effective exercise of the option, whether it is received or not.

**4. Contracts ⊕⟹22(1)—Mailing letter held effective exercise of option.**

Where a contract was made by letter, and gave one party an option to renew it by notice, either written or oral, the mailing of a letter, duly stamped and addressed, containing such notice, *held* an effective exercise of the option.

**5. Contracts ⊕⟹22(1)—Notice of exercise of option held sufficient.**

Where notice of the exercise of an option to renew a contract for a further term expressly stated that it was given "in accordance with the terms of" the contract, such terms are controlling, and the notice is to be construed according to the intention of the contract, and is not ineffective because it stated incorrectly the date of expiration of the contract.

**6. Sunday ⊕⟹17—Contracts for services on Sunday not invalid at common law.**

A contract for rendition of services in theatrical performances *held* not void because it provided that such services should be rendered on Sundays, when required "in states where Sunday performances are expressly permitted by law"; such performances not being unlawful, in the absence of prohibitory statutes.

**7. Sunday ⊕⟹17—Contract not construed to require unlawful services.**

A contract to perform in theatrical entertainments for 20 weeks *held* not one to perform on Sundays where such performances were prohibited by statute.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Shubert Theatrical Company against George Rath and Richard Rath. Decree for complainant, and defendants appeal. Affirmed.

Nathan Burkan, of New York City, for appellants.

William Klein, of New York City (Charles H. Tuttle and William Klein, both of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The plaintiff corporation is organized under the laws of the state of New York, is in business as a theatrical manager and producer of plays, and for a number of years last past was and still is engaged in producing plays and attractions at various theaters in the city of New York. It likewise presents plays on the road in a tour of the United States and Canada, and among the plays so produced is one known as "The Passing Show of 1919," in which the defendants appear.

The plaintiff on July 8, 1919, entered into a written agreement with the defendants by the terms of which the plaintiff engaged them to render their exclusive services to it for a period of one year commencing from September 1, 1919. It was agreed therein that the defend-

⊕⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ants should appear at all times as directed by the plaintiff during the year, and it was guaranteed that they should be employed for 20 weeks in the minimum, and their salary was fixed at the sum of $250 per week while appearing in the city of New York and $275 per week while on the road. It was further provided that the plaintiff had an option on the services of the defendants for the theatrical year beginning September 1, 1920, and ending September 1, 1921, provided plaintiff gave notice of its desire to exercise such option prior to July 1, 1920. If the plaintiff exercised the option reserved to it, the agreement provided that the guaranty of 20 weeks should again apply for the period, but that the salary should be $300 per week while appearing in the city of New York and $325 per week while appearing on the road. On June 7, 1920, the plaintiff pursuant to its option employed the defendants for the year beginning on September 1, 1920. Notwithstanding this, the defendants advised the plaintiff that they refused to perform according to their agreement; and it appears that they have contracted with a rival manager to appear in a production to be presented in a rival theater in the city of New York.

An injunction is asked to restrain the defendants from performing for any managers other than the plaintiff, or from performing in any other theater or place of public amusement, or in any other company, except that of the plaintiff, until the expiration of the term mentioned in the agreement made between the plaintiff and the defendants. The court below granted the injunction as prayed.

The contract is found in a letter addressed by the plaintiff to the defendants and signed "Shubert Theatrical Company, by J. J. Shubert." Then follows:

"We have read the foregoing. The same contains our full understanding, and with our signatures at the bottom hereof, let this be deemed a contract between us.　　　　　　　　　　　　　　　　　　　Geo. & Dick Rath,
　　　　　　　　　　　　　　　　　　　　　　　"By Geo. H. Rath."

The letter (contract) contains the following:

"You [the defendants] agree throughout the term hereof that you shall not render your services, nor will you appear publicly for any other firm or corporation, whether moving pictures or otherwise, without our written consent first had and obtained, and shall you attempt to appear for any other management or in moving pictures, we shall have the right to apply to any court having competent jurisdiction for an injunction restraining your appearance, and you agree, for the purpose of such lawsuit, that your services are extraordinary and unique, and you cannot be replaced, except for Morris Gest."

The performances which the defendants contracted to give are acrobatic in character. The testimony shows that their feats are unique and extraordinary. A prominent theatrical manager and producer of wide experience, and not associated with the plaintiff, testified. One of the feats of the defendants' performances, as he described it, is that one of the defendants with one hand raises the other defendant, a full-grown man, from the floor, his body being stretched at full length upon the floor. The witness, in describing it, said this was done without

apparent effort, "just as easy as you would lift a straw." In reply to a question by the court, he declared:

"It is a fact that it is the most marvelous thing that has ever been before."

He added that it had never before been done with a grown-up man in the history of this country. Another theatrical manager, of whom defendants' counsel said, "I will concede that he is a great manager and producer, and cannot be equaled in the theatrical business," and who was asked by the court whether the performances of the defendants were unique and unusual, answered, "Absolutely." He added that he did not know of any imitator in the world. Another theatrical producer, having an experience of nearly 30 years and who is widely known, testified that their performance was "absolutely unique and extraordinary." This is an excerpt from his testimony:

"One of the moves they make is taking a man underneath his body, and raising him right over his shoulder, and standing him up straight on his hands, something that has never been done, as long as my experience has been in the show business. I have never seen anything like it.

"Q. Are you an athlete yourself? A. I am.

"Q. And do these features impress you as being peculiarly difficult? A. It has never been done as long as I remember seeing anything in the show business.

"Q. Yes. Do you know from your experience whether it would be possible to replace that act by other people? A. Absolutely impossible."

The finding of the trial court that the performances of the defendants are unique and unusual is amply justified by the testimony. The services of the defendants are extraordinary, unique and cannot be replaced.

[1] These services were to be given to the plaintiffs exclusively, and the contract contains an express negative covenant that they would not be given under any other management during the period named. By a negative covenant the covenantor promises that something shall not be done. The relief appropriate to a breach of such a contract is an injunction. The leading authority, as respects covenants for personal service, is the well-known case of Lumley v. Wagner, 1 De G., M. & G. 604. In that case a famous singer agreed to sing in the opera house of the complainant for a certain time, and not to sing for any one else during that time. The opinion in that case reviews the authorities and contains what is regarded as a very able and convincing discussion of the principle applicable in such cases. As the services contracted for were those of a person possessing special and extraordinary qualifications, Lord Chancellor St. Leonards granted an injunction restraining the defendant from singing at any other theater than that belonging to the plaintiff. It was held that the fact that the court would have been unable to enforce specifically the defendant's affirmative covenant to sing at the plaintiff's theater did not affect the complainant's right to an injunction to restrain a violation of the negative covenant not to sing elsewhere.

In McCaull v. Braham (C. C.) 16 Fed. 37, Judge Addison Brown continued an injunction restraining Lillian Russell from the breach of a negative covenant not to sing in comic opera during the season at any

other than the plaintiff's theater. In addition to the negative covenant, the contract contained an affirmative covenant to sing in the employment of the plaintiff whenever required. In the course of his opinion Judge Brown said:

"Contracts for the services of artists or authors of special merit are personal and peculiar; and when they contain negative covenants which are essential parts of the agreement, as in this case, that the artists will not perform elsewhere, and the damages, in case of violation, are incapable of definite measurement, they are such as ought to be observed in good faith and specifically enforced in equity. That violation of such covenants will be restrained by injunction is now the settled law of England."

In Cincinnati Exhibition Co. v. Marsans, 216 Fed. (D. C.) 269, the complainant had employed defendant as a ball player for a certain specified period, and defendant had covenanted not to render similar service to others during the continuance of the contract. An injunction issued to prevent the breach of the negative covenant. The court, by Judge Sanborn, said:

"It is a settled rule of law that where a person agrees to render services that are unique and extraordinary, and which may not be rendered by another, and has made a negative covenant in his agreement whereby he promises not to render such service to others, the court may issue an injunction to prevent him from violating the negative covenant in order to induce him to perform his contract. The facts of this case seem to me to bring it under this rule."

In Philadelphia Ball Club, Ltd., v. Lajoie, 202 Pa. 210, 51 Atl. 973, 58 L. R. A. 227, 90 Am. St. Rep. 627, it was held that, where a baseball player had contracted to play with a particular club for a certain term, he would be enjoined from playing with another club during the continuance of the term, where the evidence showed that he was an expert player in any position, and had a great reputation among the patrons of the sport for his ability and skill.

In Pomeroy on Specific Performance, p. 31, the principle is stated as follows:

"Where one person agrees to render personal services to another, which require and presuppose a special knowledge, skill and ability in the employee, so that in case of a default the same service could not easily be obtained from others, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach."

The basis upon which the decisions rest in all such cases is that the damages for the breach of such contracts cannot be estimated with any certainty, and the employer cannot by means of any damages purchase the same services from others. The injury in such cases is irreparable. Damages which can be estimated in cases of this class only by conjecture, and not by any accurate standard, constitute such an irreparable injury as courts of equity will restrain by injunction.

In 5 Pomeroy's Equity Jurisprudence, § 289, p. 518, it is said that the doctrine of Lumley v. Wagner has been generally accepted, both in England and in this country, upon a similar state of facts. The author also states that—

"The most frequent application has been in cases of actors and actresses of established reputation. Contracts for their services often stipulate that they shall not perform elsewhere during their engagement with a particular manager. Their services being extraordinary and special, an injunction is generally granted against the breach of such a stipulation. It will likewise be granted when an artist agrees to work for the complainant and for no one else."

In the argument in this court counsel for the defendants insisted that the contract between the parties is so lacking in equitable mutuality that a court of equity should not enforce it. We are not impressed by the argument. The contract binds the complainant to give the defendants employment for at least 20 weeks in the theatrical year, "not necessarily consecutive," for which the plaintiff is bound to pay a certain specific amount. The contract also binds the defendants to render their services to the plaintiff for a like number of weeks at least, and to do so for the specified salary. That there is mutuality of obligation in such an agreement is too plain for controversy, and mutuality of obligation is sufficient to justify the issuance of an injunction to restrain the breach of the agreement if the services to be rendered are unique, special, or extraordinary, and the contract be not otherwise inequitable or oppressive. Whether the contract is inequitable or oppressive will be considered in a subsequent part of this opinion.

An application for an injunction in a case like this does not depend, as counsel for the defendants in his argument in this court seemed to think, upon the principle applicable to cases for specific performance. It is not necessary in the present case for us to inquire as to what the doctrine of mutuality means in cases of specific performance. There is a distinction between actions brought to compel the specific performance of an affirmative covenant and those which are brought to restrain by injunction the breach of a negative covenant in the same agreement. It is familiar doctrine that courts of equity do not exercise their jurisdiction to grant the remedy of an affirmative specific performance of a contract for personal services. This they decline to do, because they cannot in any direct manner compel an actor to act or a singer to sing. But the rule is established in England and in this country that the courts of equity may restrain by injunction the breach of a negative covenant by which an actor or a singer of unusual gifts has agreed not to act or not to sing in a specified period, except under the management of the other party to the contract. That this may result or may not result in indirectly compelling the specific performance of the affirmative covenant is not a matter with which this court needs in the present case to concern itself. There has been a great difference of opinion, especially in the English courts, over the question whether an injunction can issue to prevent the breach of a contract unless it contains an express negative covenant. But with that question also we are not concerned in this case, as the contract here involved does contain an express negative covenant. It is sufficient for our present purpose that a distinction exists between suits brought to compel specific performance of an affirmative covenant for personal services, and suits brought to restrain by injunction the violation of a negative covenant respecting such serv-

ices. McCall Co. v. Wright, 198 N. Y. 143, 91 N. E. 516, 31 L. R. A. (N. S.) 249.

The contract gave the plaintiff an option to renew its contract for the theatrical year from September 1, 1920, to September 1, 1921, provided it gave defendants notice in writing or orally of its desire to exercise such option prior to July 1, 1920. If the option was not exercised according to its terms, the contract has expired, the defendants have not violated it, and no injunction can issue.

The testimony shows that Mr. Shubert, the vice president of the plaintiff corporation, and who had full charge of such matters, dictated to his stenographer on June 7, 1920, a letter exercising the option; that she typed it and then handed it to Shubert, who signed it and gave it back to her; that she then handed it, properly addressed, to the head of the mailing department in the Shubert office, telling her that it was important and to mail it herself; and that the latter person stamped it and herself mailed it on the same day in a regular United States government post office box. The letter was mailed in a Shubert envelope having a return address stamped on it, and it was never returned for nondelivery. The letter was addressed to defendants, in care of the Detroit Opera House, Detroit, Mich., where the defendants were engaged for the week beginning on that day.

[2] The court below has found as a fact that the letter was written and mailed. We concur with him in that finding. The court also said that in writing and mailing the letter the plaintiff did all that was required of it under the contract. In that proposition we also fully concur; the letter having been written prior to the expiration of the option. Prior to that time the defendants are deemed in law to have been making to the plaintiff a continuing offer, and the mailing of the letter was an acceptance of it. An option, when based on a sufficient consideration, is a contract by which one binds himself to sell property or perform services, and leaves it discretionary with the other to take the property or accept the services on the terms specified. In such a contract two elements exist: First, the offer to sell or to render service which does not become a contract until accepted; second, the completed contract to continue the offer or leave it open for the time named. Black v. Maddox, 104 Ga. 157, 162, 30 S. E. 723.

An option is said in Milwaukee Mechanics' Ins. Co. v. B. S. Rhea & Son, 123 Fed. 9, 11, 60 C. C. A. 103, to be nothing more than a continuing offer to sell. In Standiford v. Thompson, 135 Fed. 991, 996, 68 C. C. A. 425, 430, it is defined as "an unaccepted offer to sell," and it is said to be "a continuing offer until the expiration of the time limited." In McMillan v. Philadelphia Co., 159 Pa. 142, 28 Atl. 220, it is said that an option is an unaccepted offer, which becomes a binding contract when the holder of the option signifies that he accepts the offer within the time fixed. And an option is defined in Adams v. Peabody Coal Co., 230 Ill. 469, 82 N. E. 645, as a continuing offer, which the offerer may not withdraw until the expiration of the time limited. In Rease v. Kittle, 56 W. Va. 269, 49 S. E. 150, it is said that "an option contract to purchase is but a continuing offer to sell." In 35

Cyc. 56, it is said that an option is a continuing offer or contract by which the owner stipulates with another that the latter shall have the right to buy the property at a fixed price within a certain time. And see Ganss v. J. M. Guffey Petroleum Co., 125 App. Div. 760, 110 N. Y. Supp. 176, 177; Sizer v. Clark, 116 Wis. 534, 93 N. W. 539; Snider v. Yarbrough, 43 Mont. 203, 115 Pac. 411; Bates v. Woods, 225 Ill. 126, 80 N. E. 84; John v. Elkins, 63 W. Va. 158, 59 S. E. 961.

[3] The law is settled that, if a letter accepting an offer is made in the manner either expressly or impliedly indicated by the party making the offer, it makes no difference whatever that the letter is never received because of some mistake of the post office authorities, or through accident in transmission, or because in some way it becomes lost. Patrick v. Bowman, 149 U. S. 411, 13 Sup. Ct. 811, 866, 37 L. Ed. 790; Tayloe v. Merchants' Fire Ins. Co., 9 How. 390, 13 L. Ed. 187; Burton v. United States, 202 U. S. 344, 384–386, 26 Sup. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; MacTier v. Frith, 6 Wend. (N. Y.) 103, 21 Am. Dec. 262; Vassar v. Camp, 11 N. Y. 441; Trevor v. Wood, 36 N. Y. 307, 93 Am. Dec. 511; White v. Corlies, 46 N. Y. 467; Howard v. Daly, 61 N. Y. 362, 19 Am. Rep. 285; Mercer Electric Mfg. Co. v. Conn. Electric Manufact. Co., 87 Conn. 691, 89 Atl. 909; Perry v. Mt. Hope Iron Co., 15 R. I. 380, 5 Atl. 632, 2 Am. St. Rep. 902. The law of England is to the same effect, Brogden v. Metropolitan R. Co., 2 App. Cas. 666; In re Marseilles Imperial Land Co., L. R. 15 Eq. 18.

It is necessary, therefore, to inquire whether under the circumstances the plaintiff had a right to use the mails for the purpose of communicating its exercise of its option. The plaintiff was expressly authorized by the defendants to exercise the option in writing orally. We think that this gave it the right to communicate by mail its written acceptance of the offer. Authorization to communicate acceptance by mail is implied in two cases:

(1) Where the post is used to make the offer and says nothing as to how the answer is to be sent.

(2) Where the circumstances are such that it must have been within the contemplation of the parties that according to the ordinary usages of mankind the post might be used as a means of communicating the acceptance. Menthorn v. Fraser, [1892] 2 Ch. 27; Carey v. Rocts, 5 Dom. L. R. 670; Ellis v. Block, 187 Mass. 408, 73 N. E. 475; Campbell v. Beard, 57 W. Va. 501, 509, 50 S. E. 747. See 13 C. J. p. 300, § 116.

[4] Where authority is given to accept in writing an offer which was made orally, the offeree has a right to understand, in our opinion, that he is at liberty to send his answer by post; and if he incloses the writing in an envelope properly stamped and addressed, and deposits it either in the post office or in a street letter box which is a part of the post office system for the transmission of mail, he has done all that is required. Wood v. Callaghan, 61 Mich. 402, 28 N. W. 162, 1 Am. St. Rep. 597.

[5] It appears, however, that the written notice which was deposited in the mails was not in all respects accurate. The notice was in the following form:

"June 7, 1920.

"Dear Sirs: In accordance with the terms of our contract dated July 8, 1919, we hereby notify you that we exercise our option for your services to continue with us, commencing October 1, 1920, and expiring on October 1, 1921, at salary as contained in said contract.

"Very truly yours,　　　　　　Shubert Theatrical Company,
　　　　　　　　　　　　　　　　"By J. J. Shubert.

"Rath Bros., Passing Show, Detroit Opera House, Detroit, Michigan.
　"JJS/HC"

Under the contract the period of renewal, as before pointed out, was from September 1, 1920, to September 1, 1921. The notice as given substituted "October" for "September." But the notice distinctly described itself as a renewal "in accordance with the terms of our contract" "at salary as contained in said contract." The mention of "October" for "September" was a palpable slip, which could have misled no one, and which did not vitiate the notice. Where a contract is specifically mentioned in a notice given under it, the terms of the contract are controlling. A notice given under a contract is to be construed according to the intention of the contract. 29 Cyc. 1124.

[6] Counsel for defendant insisted in this court that the contract is illegal and cannot be enforced, because it requires the defendants to give acrobatic performances in the city of New York on Sundays, the giving of which is prohibited by the Penal Law of the state of New York (Consol. Laws, c. 40). Section 2143 of that law is as follows:

"All labor on Sunday is prohibited, excepting the works of necessity and charity. In work of necessity or charity is included whatever is needful during the day for the good order, health or comfort of the community."

Section 2152 of the law expressly mentions acrobatic performances among the performances the rendition of which on Sunday is declared unlawful and punishable as a misdemeanor. The provision is found in part in the margin.[1]

The statute of 29 Charles II, c. 7, 1676, seems to have laid the foundation for the Sunday observance laws of England and of those in this country. It provided in its first section that—

"No tradesman, artificer, workman, labourer, or other person whatsoever shall do or exercise any worldly labour, business or work of their ordinary callings, upon the Lord's Day, or any part thereof (works of necessity and charity only excepted)."

In 27 Am. & Eng. Encyc. of Law, 389, it is said that—

"At common law judicial proceedings only were prohibited on Sunday. A person was not prohibited from doing his ordinary labor on Sunday, and the making of contracts was lawful."

---

[1] "The performance of any tragedy, comedy, opera, ballet, farce, negro minstrelsy, negro or other dancing, wrestling, boxing with or without gloves, sparring contest, trial of strength, or any part or parts therein, or any circus, equestrian or dramatic performance or exercise, or any performance or exercise of jugglers, acrobats, club performances or rope dancers on the first day of the week is forbidden; and every person aiding in such exhibition, performance or exercise by advertisement, posting or otherwise, and every owner or lessee of any garden, building or other room, place or structure, who leases or lets the same for the purpose of any such exhibition, performance or exercise, or who assents to the use of the same, for any such purpose, if it be so used, is guilty of a misdemeanor. * * *"

In 37 Cyc. 545, it is also said that—

"At common law all business other than judicial proceedings could be lawfully transacted on Sunday."

In Frolich on the Law of Motion Pictures and the Theater, p. 391, it is said:

"Sunday was not a dies non under the common law, and all regulations respecting the observance of Sunday and the prohibition, of particular lines of activity are purely of statutory creation."

The law as above stated is supported by a number of court decisions. See Heisen v. Smith, 138 Cal. 216, 71 Pac. 180, 94 Am. St. Rep. 39; Ward v. Ward, 75 Minn. 269, 77 N. W. 965; Merritt v. Earle, 29 N. Y. 116, 86 Am. Dec. 292; Boynton v. Page, 13 Wend. (N. Y.) 429; Eden v. People, 161 Ill. 296, 43 N. E. 1108, 32 L. R. A. 659, 52 Am. St. Rep. 365; Marengo v. Rowland, 263 Ill. 531, 105 N. E. 285, Ann. Cas. 1915C, 198. In Richardson v. Goddard, 23 How. 28, 42, 16 L. Ed. 412, Mr. Justice Grier, of the Supreme Court of the United States, calls attention to the fact that in England formerly the courts sat even on Sunday, and that contracts made on that day were not regarded as void till the statute of 29 Charles II, c. 7 (not 27, as he erroneously states), was enacted.

We assume that, in the absence of a statute, participation in innocent amusements on Sunday is lawful. We also assume that contracts to perform on Sunday something prohibited by statute are void. It has been held that, where a contract provides for the performance on Sunday of acts prohibited by the statute, the entire contract is void, and no recovery can be had for the part performed on a secular day. Stewart v. Thayer, 170 Mass. 560, 49 N. E. 1020; Handy v. St. Paul Globe Publishing Co., 41 Minn. 188, 42 N. W. 872, 4 L. R. A. 466, 16 Am. St. Rep. 695; Williams v. Hastings, 59 N. H. 373.

The contract here involved, as expressly stated in its opening paragraph, is an engagement of the exclusive services of the defendants at any place or places that the plaintiff designates in the United States of America and Canada. So far as Sunday performances are referred to, the contract provides as follows:

"In states where Sunday performances are expressly permitted by law, you agree to appear and perform."

And it also provided that:

"We have the right to the use of your services in any theaters wherein we shall give Sunday concerts, and you shall appear and play in such concerts whenever we shall give you two (2) days' notice prior thereto of our desire to have you appear and naming the place where. Should you be out of the city of New York if such notice reaches you, you shall pay your expenses to the city where said concert is given and the return to your city of engagement."

An examination of these clauses shows, not only that the parties did not agree to violate any Sunday observance statute, but that the intention was that there should be no performances by the defendants on such days except in states where Sunday performances "are expressly permitted by law." The two clauses of the contract relating

to Sunday performances must be read together, and they in no way bind the defendants to appear anywhere in violation of any Sunday law. The reference to the city of New York, found in the second clause, is not a reference to that city as a place of performance, but as fixing the length of notice. If the plaintiff undertook to require the defendants to perform on Sunday in any state where such performances are prohibited by statute, the defendants would have been under no obligation to appear, and their refusal would not have involved any breach of contract.

[7] An agreement to perform for 20 weeks is not an agreement to perform on Sunday. Goddard v. Morrissey, 172 Mass. 594, 53 N. E. 207. In Kelley v. London Pavillion, 77 Law Times, 215, where a music hall artiste engaged to perform "every evening," this was held to mean "every evening on which the music hall may be legally opened and the artistes called upon to perform." In Zenatello v. Hammerstein, 231 Pa. 56, 79 Atl. 922, the plaintiff had bound himself to sing certain operas "each day of the week" in New York and elsewhere in the United States. The court said the law would not presume that the parties intended an unlawful thing. The presumption was that the plaintiff would not be required to sing on Sundays, except in places where such singing was permitted; and in the instant case it cannot be said that the contract in any way violates the Sunday observance law of the state of New York.

It certainly will not be claimed by any one that there is anything intrinsically immoral or any immoral tendency connected with an athletic performance such as that given by these defendants. In this connection it is interesting to note a decision under the Sunday law of Missouri. The statute prohibited horse racing, cock fighting, or playing cards or games of any kind on Sunday. The statute was construed in St. Louis Agl. & Mech. Association v. Delano, 37 Mo. App. 284. In an opinion written by Judge Seymour D. Thompson he said that—

"This court is of the opinion that this prohibition is against games of chance or other games of an immoral tendency, and that it does not involve a prohibition of athletic games or sports, which are not of an immoral tendency, but which tend to the physical development of the youth, and are rather to be encouraged than discouraged."

The case was affirmed by the Supreme Court in 108 Mo. 217, 18 S. W. 1101.

But it is said that a court of equity does not grant an injunction to prevent the breach of a negative covenant where the contract is inequitable, or harsh, or in any way oppressive. We do not dispute the statement. It is not applicable to the particular contract under review. We have examined its provisions with care, and we have failed to discover that it contains anything which can be regarded as unfair, oppressive, or in any way inequitable. It guarantees to the defendants a salary for the year of the renewal of at least $6,000, with a possible maximum of $16,900. In accordance with its provisions and during the first year of the contract the defendants received from the plaintiff over $10,000.

During the year of the renewal the defendants were to receive a larger salary and might realize in that year about $28,000 or $29,000 from the contract. The salary paid them was three times the salary received by the usual acrobatic performers. There is nothing unusual or unfair in the provision that during the period of their engagement with the plaintiff the defendants are not publicly to appear under another management or in connection with a rival company. The contract was not induced by fraud or misrepresentation. The defendants made it of their own free will and with full knowledge of all that it contained. Contracts are made to be kept and not broken, and the parties who make them are in duty and in law bound to perform them. The injunction should issue as prayed.

Decree affirmed.