Rollingwood Corporation v. Commissioner. David D. Bohannon, Transferee v. Commissioner.
Rollingwood Corp. v. Commissioner
Docket Nos. 20002, 20003.
United States Tax Court
1950 Tax Ct. Memo LEXIS 147; 9 T.C.M. (CCH) 597; T.C.M. (RIA) 50180; July 17, 1950
Frank C. Nelson, C.P.A., Fred H. Brown, C.P.A., and Justin M. Jacobs, Esq., 403 Merchant Exchange Bldg., San Francisco, Calif., for the petitioners. Charles W. Nyquist, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: These proceedings were consolidated for trial and opinion. The Commissioner has determined deficiencies in the income and excess profits tax liability of the Rollingwood Corporation in Docket No. 20002, as follows: Fiscal Year
Income
Excess
Ended
Tax
Profits Tax
May 31, 1944
$ 1,406.58
May 31, 1945
12,316.61
$3,315.26
May 31, 1946
5,171.02
May 31, 1947
28,237.35
$41,960.54
$8,486.28
The parties have stipulated, in Docket No. 20003, that David *148 D. Bohannon is the transferee of the assets of the Rollingwood Corporation and that, as transferee, he is liable for any deficiencies in Federal taxes due from the Rollingwood Corporation. The Rollingwood Corporation will hereinafter be referred to as the petitioner. The only issue for decision is whether gains realized from the sales of certain houses are taxable as ordinary income under section 22 (a), or as capital gains within the meaning of section 117 (j) of the Internal Revenue Code. Certain other adjustments made in the petitioner's income are not in dispute. Both the petitioner and David D. Bohannon filed their returns for the years in question with the collector for the first district of California. The record in this proceeding consists of a stipulation of facts and various exhibits. Findings of Fact The facts which have been stipulated are adopted as part of our findings of fact. David D. Bohannon has for many years, including the years in question, been actively engaged in the real estate business in California. During 1942, the industrial area in and adjacent to Richmond, California, was engaged in extensive production for the war *149 effort. The influx of the many defense workers created a serious housing shortage in the area, and Bohannon, upon request by the general manager of the Richmond Shipyards, agreed to undertake the building of a defense housing project in the Richmond area. In order to obtain the materials needed for the building of the homes, Bohannon filed with the Federal Housing Administration (hereinafter referred to as "F.H.A.") on October 3, 1942, an application for priorities for materials to be used in the construction of 400 homes for defense workers. In the application, Bohannon agreed that the housing units were to be disposed of to defense workers under a lease-option plan. This plan provided for a fixed monthly rental of $50, with a 30-month option to purchase the home for $4,800. If the purchase option was exercised, all prior rental payments were to be credited against the agreed purchase price. On October 26, 1942, the F.H.A. approved the application and the requested priorities were issued to Bohannon by the War Production Board. On January 9, 1943, the Rollingwood Corporation, the petitioner, was incorporated under the laws of California with Bohannon as its president. The petitioner *150 issued 50 shares of common stock at a par value of $100 per share. Twenty-six of these shares were issued to Bohannon and 24 were issued to Ross M. Chamberlain. On May 10, 1945, the petitioner reacquired Chamberlain's 24 shares. From May 10, 1945, until the dissolution of the corporation on May 31, 1947, Bohannon was its sole stockholder. Upon its dissolution on May 31, 1947, the petitioner transferred all its assets to Bohannon, and the parties have stipulated that Bohannon, as transferee, is liable for any deficiencies in Federal taxes due from the petitioner for the years in question. On January 14, 1943, Bohannon filed with the F.H.A. an application for priorities for materials to be used in the construction of an additional 300 homes, to be disposed of under the same lease-option plan as the original 400 homes. This application was approved on February 12, 1943, and the requested priorities were were issued by the War Production Board. On March 12, 1943, Bohannon and the petitioner filed with the F.H.A. an application for the substitution of the petitioner for Bohannon as the builder of the 700 homes. This application was approved within a few days, and the petitioner was *151 substituted for Bohannon as the builder of the homes for which priorities had been granted. In the spring of 1943, Bohannon & Chamberlain, a limited partnership of which Bohannon and Chamberlain were the only general partners, began the construction of the 700 homes and the subdividing and improving of the land for the petitioner. The construction of each of the 700 houses was financed by an individual loan from the Bank of America to the petitioner under Title VI of the National Housing Act, which authorized the F.H.A. to expedite defense housing by the guarantee of loans made by private lending institutions on such properties upon their completion. As a condition to making the loans, the Bank of America required Bohannon and Chamberlain to personally guarantee each loan until construction was completed. The petitioner also borrowed $600,000 on an open account from the Bank of America. This loan was also personally guaranteed by Bohannon and Chamberlain. During their construction, the houses were advertised for rent by the petitioner. By August 14, 1943, all the homes were completed and ready for occupancy. Immediately upon completion, each of the houses was leased to a defense *152 worker under a lease-option agreement which provided for a month-to-month tenancy at a rental of $50 per month, renewable at the option of the tenant for a period of 30 months. The agreement also gave the tenant an option to purchase the property for a stated sum. If the option to buy was exercised, the agreement provided that all rental payments previously made would be credited against the stipulated purchase price. Upon exercise of the option the tenant was also required to pay to the petitioner interest at the rate of $36 per year from the date of the original lease-option agreement until the option was exercised. The tenant was also required to assume the unpaid balance of the loan by the F.H.A. against the property. In its income tax return for the fiscal year ended May 31, 1944, the petitioner stated that its business was the "Development of subdivision and selling of homes to defense workers." In its returns for the fiscal years ended May 31, 1945, May 31, 1946, and May 31, 1947, it stated that its business was the "Development of subdivision - renting and selling homes." During the years in question, sales of the houses by the petitioner were frequent and continuous. All *153 sales were made by salaried employees of the petitioner. Detailed information relating to the houses sold is as follows: Number of
Houses Sold
Number
Number
to Tenants
of
of
Who
Number
Houses
Houses
Rerented
of
Sold
Sold
Without
Gross
Fiscal Year
Houses
Under
to Non-
Option
Profit
Ending
Sold [1]
Option
Tenants
to Buy
on Sales
May 31, 1944
32
4
28
0
$ 15,946.04
May 31, 1945
224
46
175
3
144,191.74
May 31, 1946
357
221
136
0
183,421.46
May 31, 1947
188
15
165
8
243,675.12
Totals
801
286
504
11
$587,234.36
The houses in question were held by the petitioner primarily for sale to customers in the ordinary course of trade or business. Opinion The issue in this proceeding is whether certain houses were held by the petitioner primarily for sale to customers in the ordinary course of trade or business as conducted by respondent, or whether the properties in question were held *154 primarily for rental purposes as contended by the petitioner. If the houses were held primarily for sale to customers in the ordinary course of trade or business, the gain upon their sale is taxable as ordinary income. Spanish Trail Land Co., 10 T.C. 430. However, if the houses were held primarily for rental purposes, the gain from their sale is taxable as capital gain under section 117 (j) of the Internal Revenue Code. Nelson A. Farry, 13 T.C. 8. Examination of all the evidence present in this proceeding persuades us that the properties in question were held by the petitioner primarily for sale to customers in the ordinary course of trade or business. Priorities for the materials needed to construct the houses were granted by the F.H.A. and the War Production Board under an agreement which provided that the houses in question were to be leased on month-to-month tenancies at $50 per month. However, this agreement also provided that the lessee would have a 30-month option in which to purchase the house. The only restriction placed by the governmental agencies on the sale of the houses was that so long as he was not in default, the lessee would have a *155 30-month option to purchase. More important, if he exercised this option, the rental payments which he had previously made would be credited against the stipulated purchase price. These provisions were incorporated in each of the leases executed by the petitioner. The option to purchase the property contained in each lease constituted a continuing offer by the petitioner to sell the property. Shubert Theatrical Co. v. Rath, 271 Fed. 827; Warner Bros. Pictures v. Brodel, 31 Cal. (2d) 766, 192 Pac. (2d) 949; certiorari denied, 335 U.S. 844. The rental payments received by the petitioner from a lessee constituted payments on the stated purchase price if the lessee decided to exercise his option. In August of 1943, the construction of all of the houses had been completed, and as of May 31, 1944, the end of a fiscal year of petitioner, 32 houses had been sold. Sales continued. As of May 31, 1946, there had been 613 sales, and as of May 31, 1947, the venture was practically concluded, petitioner retaining only four houses. Sales were made to the original lessees, or in some instances to others after the original occupants had failed to exercise options *156 to buy, or had defaulted. Of the 700 houses which were constructed 699 were sold during the fiscal years involved in this proceeding, of which 105 were reacquired by petitioner under repossession or repurchase and then resold during the taxable years, excepting three. The evidence shows that petitioner's sales of the houses were continuous and frequent - not casual or infrequent. Cf. James Lewis Caldwell McFaddin, 2 T.C. 395; Miller v. Commissioner, 102 Fed. (2d) 476. The total net profit from all of the sales during the years before us (reported on an installment basis) amounted to $587,234.36. From all of the facts in this proceeding, it must be concluded that the houses in question were held primarily for sale in the ordinary course of petitioner's business. The fact that some rental income was received pending exercise of options to buy and ultimate sales does not militate against the foregoing conclusion. See Neils Schultz, 44 B.T.A. 146; Charles H. Black, Sr., 45 B.T.A. 204; Walter G. Morley, 8 T.C. 904. The petitioner relies solely upon the holdings of this Court in the unreported proceeding of Elgin Building *157 Corporation, Docket Nos. 14049, 14050, and 14051, Memorandum Findings of Fact and Opinion entered on February 15, 1949 [8 TCM 115; but the facts in that proceeding differed from those in this proceeding. Therefore, we cannot reach the same result here. Cf. Louis Rubino, Docket Nos. 16667 and 16668, Memorandum Findings of Fact and Opinion entered on December 28, 1949 [8 TCM 1095. It is held that the gains realized from the sales of the houses are taxable as ordinary income. The respondent's determinations are sustained. Decisions will be entered for the respondent. Footnotes
1. The total number of houses sold exceeds 700, the number constructed, because the petitioner reacquired 81 houses by repossession and 24 by repurchase. On May 31, 1947, it owned 4 of the houses.↩