### WINTER GARDEN CO. v. SMITH et al.

(Circuit Court of Appeals, Second Circuit. April 21, 1922.)

No. 302.

**1. Contracts ☜261(2)—Ground of rescission held insufficient.**

Where defendants contracted with plaintiff to appear in vaudeville under their individual names, and in advertising their act plaintiff used the name under which they had previously appeared, but, when its attention was called to the error, used due diligence to correct it according to contract, defendants *held* not to have ground for rescission.

**2. Injunction ☜60—Will lie to enforce breach of negative covenant in contract for personal services, where indispensable.**

Where services contracted for are specially skillful and individualistic, and hence unique in character, and therefore impossible to purchase of another, a court of equity will enjoin the breach of a negative covenant in the contract that the services contracted for shall not be rendered to another during the contract term.

**3. Injunction ☜59(1)—Equity will not tolerate unconscionable breaches of contract.**

A court of equity is a court of conscience, which within the scope of its powers is governed by its own rules, and it manifests its value in the administration of justice in no more effective way than in constantly making clear that it will not tolerate deliberate and unconscionable breaches of contract.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Winter Garden Company against Joe Smith and Charles Dale. From a decree enjoining defendants from giving any theatrical performance, except in accordance with contract with plaintiff, defendants appeal. Affirmed, with directions.

Kendler & Goldstein, of New York City (Edward E. McCall, Julius Kendler, Monroe M. Goldstein, all of New York City, of counsel), for appellants.

William Klein, of New York City (Charles H. Tuttle and William Klein, both of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. Smith and Dale for many years have played in vaudeville in a quartette under the name of "Avon Comedy Four." Two of the four were always Smith and Dale, who gave the performance an individualistic character. The other two were any available actors competent to act as foils or "players up" to Smith and Dale in carrying out the various things the latter did in the course of the performance.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On April 30, 1921, plaintiff and defendants entered into a contract under which plaintiff engaged the exclusive services of defendants for the theatrical season beginning September 1, 1921, and ending on or about September 1, 1922, at $900 per week for 30 weeks. The contract further provided for a similar engagement for the year September 1, 1922–September, 1923, at $1,000 per week, and gave plaintiff an option on defendants' services for the year 1923–1924 at $1,100 per week for 30 weeks. Thus the totals were $27,000 for the first theatrical year, $30,000 for the second and $33,000 for the third. It was further provided that, if plaintiff elected to place defendants in a vaudeville company headed by them, it would pay defendants 15 per cent. of the net profits in addition to the salary.

Plaintiff, under the agreement, had the right to elect to add two persons, so as to make the quartette complete, but in that event plaintiff was to pay the salaries of such "additional members," and (paragraph 16):

"In the event that we (plaintiff) shall use the quartette, we will eliminate the title of Avon Comedy Four and bill you as Joe Smith and Charles Dale."

It was further agreed under paragraph 7 as follows:

"You now admit that you are an artist of magnitude sufficient to carry one of the leading parts in the Winter Garden attractions, or any other attraction, and that no one can be engaged to replace you in your particular line in the event of your refusal to perform. You agree, therefore, that the salary herein required to be paid you is being paid because of your exceptional talents, and because such services are unique and extraordinary."

Since 1916 defendants had been playing a burlesque act called "Hungarian Rhapsody," and for some time prior to April, 1921, had been employed by theatrical managers named Shubert (who are the same persons controlling plaintiff corporation) in a musical extravaganza entitled "The Passing Show of 1919." In this theatrical entertainment, defendants were billed as "The Avon Comedy Four" and the act was called "Hungarian Rhapsody." The engagement of defendants expired in May or June, 1921, and it was in anticipation of the next season that J. J. Shubert, on behalf of plaintiff, made the contract, supra. Under the new engagement, plaintiff could require defendants to appear in any play.

Between May or June, 1921, when defendants' engagement in the "Passing Show of 1919" ended, and the beginning of the season in September, under the April 30, 1921, contract would commence, defendants were out of an engagement. Shubert then employed them at $150 per week as a temporary expedient in a performance called "The Whirl of New York," which began late in June or early in July, 1921. This production, however, was not a financial success, and in July Shubert found it impossible to continue defendants, and thereupon employed others at a salary of $400 per week, and in turn discontinued their employment, because of the failure of "The Whirl of New York." It is significant that defendants, according to their manager, Max Hart, told him that "they were very much annoyed because they had been retired" from "The Whirl of New York" Company, and that "they did not want to work for Shuberts any longer."

The opening of plaintiff's vaudeville at the Winter Garden was to be on Monday, September 26, 1921, and about Tuesday, September 20, plaintiff began its advertising. One Arthur Klein was the general manager of the Shubert Vaudeville Exchange, and in that capacity had charge of "many theaters, including the Winter Garden, and of many actors." Having had no part in making the contract with defendants, he had quite naturally assumed that defendants would wish to be billed as "The Avon Comedy Four," and had so billed and advertised them.

On the afternoon of September 22, Smith and Dale visited Klein and stated that the contract entitled them to be billed as "Smith & Dale." Klein thereupon in defendants' presence called up Shubert on the telephone, and Shubert, having looked over the contract to refresh his memory, saw that defendants' contention was right and instructed Klein that "he should immediately change it." Klein informed defendants that "it will be changed immediately," and defendants told Klein "that unless it was changed they would not go on." Smith, in colloquial language, speaking for himself and Dale, did not refuse to "go on," but said to Klein, among other things, "I am not going to tell you again after I leave here, if the billing of Avon Comedy Four is not eliminated, and Joe Smith and Charles Dale billed only as per contract, we will not appear Monday," and after this, as Smith testified, "they both walked out."

The evidence leaves no doubt that the billing of defendants as Avon Comedy Four was wholly inadvertent, and that Shubert and Klein in complete good faith intended to rectify the error, and that defendants were so informed. It is equally clear that defendants were seeking some excuse to avoid their contract. The billing or advertising consisted of newspaper advertisements, electric signs, and billboards. Although plaintiff had only the last part of Thursday afternoon, Friday, and Saturday in which to rectify the unintentional error, Klein bent his efforts to that end, and, considering the difficulties involved in straightening out the detail of such a situation, he did remarkably well. The Sunday advertisements in all the newspapers were corrected. The very large electric sign in front of the theater was changed by Friday night, and "Smith and Dale" received the place next to the "headliner."

The three sheet bill posters were obliterated with a very few exceptions out of a total of 50, notwithstanding the short time (owing to union hours of the Bill-Posting Union) in which the work had to be done. These few exceptions, of which much is made, as well as the failure (because of no fault of plaintiff) to eliminate the newspaper advertising on Friday and in one paper on Saturday, are trifling and negligible matters, as opposed to the substantial and effective advertising of all kinds accomplished to substitute "Smith and Dale" for "Avon Comedy Four." There were also some "twenty-four sheet bills," on, perhaps, 50 billboards, which, owing to the short space of time, the union hours, and the physical difficulties involved, had not been attended to by Monday, although Klein had given instructions to change all billing immediately. These bills were mainly on high buildings and

scattered about the greater city, most of them being in Long Island City.

Notwithstanding these genuine and for all practical purposes successful efforts under Klein's instructions to meet Smith and Dale's objections, the latter failed to appear at rehearsal on Monday, September 26. The matinee, admission to which began at 1:30 p. m., was delayed until Klein could get in touch with Hart, defendants' manager. Hart, who was not in any manner responsible for defendants' conduct, knew nothing about the situation, and finally Klein succeeded in getting some other actors to fill the gap with a different "act." The next day, Tuesday, September 27, Smith was in the office of one Hayes for the purpose of getting a booking with Keith's, a competitor, of the Shuberts. The day following Smith was again at the Hayes office. Hayes, according to Smith's testimony, said he "could get us booking, but it would have to be as the Avon Comedy Four." "I merely asked him," Smith further testified, "whether he could secure any booking, and he says, 'Yes; as the Avon Comedy Four.' I says, 'All right; then go ahead.'"

On October 3, 1921, defendants opened with Keith's at the Keith's Royal Theater in New York City, as "Avon Comedy Four" at $1,250 per week, out of which they paid the two men whom the Shuberts had engaged for them at $85 and $150 per week, respectively. Very shrewdly, this contract was for a week, and week by week similar contracts have been made for other Keith theaters. Thus it was that, within a few days after defendants had failed to appear at the Winter Garden, they had made a contract and were playing at a salary which net to them was fully as much as plaintiff had agreed to pay, and were not only advertised extensively as the "Avon Comedy Four," but, as an essential element of their contracts with Keith, had agreed to be billed as the "Avon Comedy Four."

[1] We shall not go into further details, for on this branch of the case we can only say that there has rarely come to our attention a more flagrant instance of a deliberate and inexcusable breach of contract. If there is any principle of law to be invoked, where the facts leave no room for discussion, the case in this regard was well disposed of by Judge Augustus N. Hand, when he said:

"The law is not a mere game, the rules of which are made to surprise or confound the participants, but its rules are aimed at working out the justice in a world where perfection and ideal adjustment are rarely possible. If a promise in a contract has been substantially performed, and no appreciable damage can result from a slight failure of performance, a trifling lapse, even in limine, cannot justify recission. All the more is this the case when the failure relates, not to the main consideration, but to a collateral promise. Human affairs do not run so smoothly, and business engagements are not so perfectly adjusted, that any other doctrine would be practicable, or even tolerable. * * * In this case the defendants did not elect to rescind, even if they had had the right to do so, when they first discovered the wrong advertising. They insisted that the complainant should correct it. The complainant proceeded in good faith and with great diligence to change the advertising and complete the most important change, which was in the newspapers, in time to have the full Sunday advertising in the exact form called for by the contract. It would be quite unreasonable to hold that the difficulty, if not impossibility, of changing all the bill posters in such a short time as

that intervening between September 22 and September 26, would furnish a ground for rescission. The defendants' real position, and the comparative unimportance to them of the clause for billing in their own names, is shown by their immediate engagement with Keith to play as members of Avon Comedy Four. How little an effect a few mistakes in advertising during a period of less than a week could have on a contract lasting from two to three years requires no discussion."

[2] There remains for consideration only the contention that the performance of defendants was not of a character which a court of equity will enjoin, because the services to be rendered were not unique and extraordinary. We need not analyze at length the testimony of the experts. The so-called acting of defendants was of the clean low comedy order, affording amusement to that part of the public which regards such performances as entertaining and recreative. No one was better qualified to describe defendants than Hart, who had been their manager for 14 years. He testified:

"They are very talented, because they could do all kinds of entertainment; outside of being comedians, they had the ability of doing grotesque gymnastics, which very few comedians could do; besides, they were capable dancers and singers."

Hart further said that the reputation of defendants was "very, very big," and that the compensation paid was the highest salary of which he knew for a quartette of this kind. Obviously so large a compensation would not be paid by the Shubert or Keith organizations, unless these defendants had that kind of ability which draws audiences, and hence makes their employment commercially valuable, both to them and to the theatrical producer.

We hardly need expert testimony to inform us that what one of the witnesses called "personality" is what counts. One performer can speak or act a line of a play, which to a layman would be dull or meaningless in cold print, in such manner as to provoke laughter or tears, while another would call forth no emotion. Gesture, expression, method of speech rendition, keen understanding of what provokes amusement, are all part of those accomplishments which make one man a successful comedian and another a failure. When, therefore, actors such as these have been successful for many years because of individual characteristics, and command salaries of a size rarely known in the liberal arts and sciences, their peculiar ability in the field in which they perform is almost res ipsa loquitur.

Each case necessarily stands on its own facts, and whether a particular actor falls within the class of cases where an injunction will lie against him for breach of his negative covenant is in last analysis a question of fact. Thus an examination of the many cases of this character will show a wide range of performances which have come under the consideration of the courts, and opposing illustrations may be selected at random. Thus, in Hammerstein v. Mann, 137 App. Div. 580, 122 N. Y. Supp. 276, the defendant was "a singer of stock parts, at a moderate salary, which parts many other members of the company have sung," and the court reversed an order below granting an injunction, while the same court, in Shubert v. Angeles, 80 App. Div. 625, 80 N. Y. Supp. 146, approved an order granting an injunction in a case where

defendant was employed "because of her special talent as a mimic." Further detailed discussion, however, is not necessary, in view of this court's recent decision in Shubert Theatrical Co. v. Rath, 271 Fed. 827, in which the principles governing cases of this character were fully reviewed.   See, also, Comstock v. Lopokowa (C. C.) 190 Fed. 599.

Our attention has been called to a recent decision of the Appellate Division, First Department, in Shubert Theatrical Co. v. Gallagher, 200 App. Div. 596, 193 N. Y. Supp. 401, but obviously the facts in that case were quite different from those in the case at bar. In this case the testimony fully supported the conclusion of the District Court as to the specially skillful and individualistic, and hence unique, character of defendants' services.

[3] From decisions of this court over a long period of years it must be apparent that we are not astute to find some way in which breaches of contract may be excused. A court of equity is, as was said in T. B. Harms & Francis, Day & Hunter v. Stern, 231 Fed. 645, 648, 145 C. C. A. 531, 534, "a court of conscience, which within the scope of its powers is governed by its own rules," and it manifests its value in the administration of justice in no more effective way than in constantly making clear that it will not tolerate deliberate and unconscionable breaches of contract.

The decree is affirmed, with costs, and it is ordered that the suspension of the injunction pending appeal is vacated as of the day following the filing of this opinion.