## ASSOCIATED NEWSPAPERS v. PHILLIPS.

(Circuit Court of Appeals, Second Circuit. November 19, 1923.)

No. 151.

**1. Master and servant ⬉8(1)—Contract may fix definite term of service.**

An indefinite hiring, without any agreement as to the duration of the services, is presumed to be a hiring at will, in the absence of evidence of custom, or of facts and circumstances showing a contrary intention of the parties, but the contract may fix a definite term.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Master and servant ⊙⇒9—Continuation in employment after expiration of term presumed to be on same terms.**

Where one enters into another's service for a definite period, and continues in the employment after the expiration of that period without any new agreement, the legal presumption is that the employment is continued on the terms of the original contract.

**3. Sales ⊙⇒5—Contract to furnish newspaper articles held one of hiring, and not of sale; "contract of sale;" "contract for services."**

A contract by which defendant agreed to furnish to complainant six newspaper articles per week for a definite term, which articles from their nature were required to be written by defendant, and from day to day, *held* not a "contract of sale" of the articles, but one for services to be rendered.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract of Sale.]

**4. Injunction ⊙⇒60—Will be granted to enforce negative covenant in contract for personal services, where unique.**

A court of equity will enforce by injunction a negative covenant in a contract that services contracted for shall not be rendered to another during the contract term, where the services are unique in character and cannot readily be obtained from others.

**5. Injunction ⊙⇒60—Contract for exclusive use of feature newspaper articles held enforceable.**

Where defendant had acquired a reputation as a writer of feature articles for the daily press, which were unusual and distinctive, and therefore unique, a newspaper syndicate, which had contracted for the exclusive use of such articles for a definite term, *held* entitled to an injunction to restrain defendant from furnishing such articles to others during the term.

**6. Injunction ⊙⇒60—Option contract held enforceable.**

When defendant was writing feature articles for a New York newspaper, complainant contracted with him for the exclusive right to syndicate his articles for publication outside of New York City for the year 1922, for which it paid him a sum weekly. The contract further provided that, should the New York paper cease to pay him his present salary, complainant should have the option to pay it in addition to the contract sum and have the exclusive right to publication of his articles, both within and without the city, and that such option should continue through 1923 and 1924. Defendant continued to furnish articles under the contract until June, 1923, when the New York paper was sold and complainant notified him that it elected to exercise its option. *Held*, that such election created a valid contract until the end of 1924, and that defendant was properly enjoined from furnishing his articles to others during its term.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in equity by the Associated Newspapers against Henry I. Phillips; the name "Henry" being fictitious, defendant's real name being unknown to complainant. From an order granting a preliminary injunction, defendant appeals. Affirmed.

Taylor, Jackson, Brophy & Nash, of New York City (Charles B. Brophy, of New York City, of counsel), for appellant.

Kellogg, Emery, Inness-Brown & Cuthell, of New York City (Dean Emery and J. Fearon Brown, both of New York City, of counsel), for appellee.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from an order enjoining the defendant pendente lite from disposing of his newspaper writings to any one except the complainant herein. The order was signed on July 30, 1923. It restrains the defendant from—

"publishing, selling, offering for sale, disposing of, or permitting the publication, either in the city of New York and vicinity, or elsewhere in the United States or Canada, of humorous articles or 'columns' of other literary matter to be used in newspapers or other periodicals, or by newspaper or other syndicates, other than the complainant herein and/or those newspapers receiving the newspaper syndicate service of the complainant, or from accepting any employment whatsoever, other than from the complainant herein, by which he shall supply or agree to supply such articles, and that the defendant be and he hereby is enjoined and restrained, pending the determination of the issues herein, from doing or permitting anything to be done directly or indirectly to the prejudice of the exclusive rights which the complainant is entitled to enjoy under its aforesaid contract with the defendant, described in the bill of complaint herein. * * * "

The complainant bases its claim to equitable relief upon an agreement which it had with the defendant for his exclusive services, and upon its further claim that the services so contracted for are of such a unique and distinctive character that they cannot be duplicated or replaced by the work of any other writer.

The complainant is a New Jersey corporation, which was incorporated in 1911. It was incorporated by the publishers of the Chicago Daily News, the Boston Globe, the Philadelphia Bulletin, and the New York Globe. It secures by contract the exclusive services of special writers, cartoonists, and other contributors of what are known as newspaper "features," and sells the use of such "features" to newspapers throughout the country. It would be quite beyond the means of most of the newspapers to purchase the output of these popular writers for exclusive use in one newspaper, whereas the syndicate makes it possible for smaller papers to avail themselves of these features at moderate cost through the syndicate. The complainant supplies its service to more than 40 newspapers throughout the United States and Canada.

The defendant resides within the Eastern district of New York, and was employed in 1918 by the New York Globe and Commercial Advertiser to edit copy. In 1920, or thereabouts, he commenced to contribute humorous paragraphs to the paper in addition to his work of editing copy. After a time he was directed to devote himself exclusively to these humorous productions, and they appeared daily in that newspaper. For more than a year immediately preceding January 9, 1922, he sold the use of these articles so appearing in the Globe to certain papers published outside of New York City, not members of the complainant association; and in the fall of 1920 the complainant obtained from the publishers of the Globe permission to syndicate his articles, but the complainant did not pay him for these articles prior to 1921, when it commenced paying him for their use by its members outside of New York City. But on January 9, 1922, the complainant and defendant signed the following paper:

"The Associated Newspapers, 114 Liberty St., New York.

"Jan. 9, 1922.

"Mr. H. I. Phillips, The Globe, New York City—Dear Mr. Phillips: In view of the fact that you are a regular daily contributor to the New York Globe, one of the directing members of the Associated Newspapers, and that you wish to place your articles in open territory outside, it is understood and agreed that the Associated Newspapers is to have the right to include your daily feature in its general service, and that the Associated Newspapers is to pay you at the rate of $75 a week during the year 1922 for the exclusive rights to your newspaper work outside of New York City. It is understood that you will supply us with six articles per week.

"In the event that the New York Globe ceases to pay you less than $150 a week in its account at any time during the year 1922, the Associated Newspapers is to have the option on your exclusive newspaper work, at the rate of $225 per week.

"It is understood and agreed that you grant to the Associated Newspapers a similar option for the years 1923 and 1924.

"Your acceptance of this letter will, we take it, constitute a proper agreement between us.

"Very sincerely yours,          [Signed]   H. H. McClure, Gen'l Mgr.
"Accepted: H. I. Phillips."

The sale of the Globe was announced in May, 1923, and the defendant began to look for another situation, which he obtained on the staff of the New York Evening World—his employment to commence on June 4, 1923, which was two days after the Globe ceased publication. On June 1, 1923, the general manager of the complainant wrote to the defendant in part as follows:

"I do not understand that the Globe has declined to continue its present arrangement with you. My information is that you have seen fit to contract with the New York World without the consent of the Globe and in disregard of your contract relations with them.

"The Associated Newspapers, therefore, claims, and it hereby exercises, the option of your exclusive newspaper work, inside as well as outside the city of New York, at the rate of $225 per week for the balance of 1923 and 1924."

The defendant, however, entered upon his employment with the Evening World, furnishing it six articles a week, and the complainant brought this suit and moved for an injunction pendente lite. It is from the order granting that injunction that this appeal is taken.

[1] The defendant contends that the first paragraph of the letter of January 9, 1922, already set forth in this opinion, did not constitute a valid binding contract of employment for that year, but was one which could have been terminated at any time by either party; in other words, that if it is a contract of employment at all, as distinguished from a sale of his articles for publication outside of New York City, it was merely a hiring at will, there being no words of employment and no fixed period of employment. We cannot accede to this view of the contract. Where a person agrees to render services to another, without any agreement as to the duration of the services, the indefinite hiring is presumed to be a hiring at will, in the absence of evidence of custom, or of facts and circumstances showing a contrary intention on the part of the parties. Truesdale v. Young, Fed. Cas. No. 14,204; Martin v. New York Life Ins. Co., 148 N. Y. 117, 42 N. E. 416, affirmed 73 Hun, 496, 26 N. Y. Supp. 283, Graves v. Lyon Bros. & Co., 110 Mich. 670, 68 N. W. 985; Kane v. Moore, 167 Pa. 275, 31 Atl. 631.

[2] But in this case there was an express agreement as to the duration of the service; it being expressly stated that it was "during the year 1922." And where one enters into another's service for a definite period, and continues in the employment after the expiration of that period without any new agreement, the legal presumption is that the employment is continued on the terms of the original contract, unless facts are proven which are sufficient to rebut that presumption. Adams v. Fitzpatrick, 125 N. Y. 124, 26 N. E. 143; O'Connor v. Briggs, 182 Mass. 387, 65 N. E. 836; Crane Bros. Mfg. Co. v. Adams, 142 Ill. 125, 30 N. E. 1030. And in the instant case the evidence shows that without any new agreement the parties continued their contractual relations during the first five months of 1923 on the same basis which existed between them during the year 1922. The claim that the defendant's contract was at will is contradicted by the defendant himself in his own affidavit, submitted in opposition to the motion for an injunction. In that he says:

"The only period during which the complainant association had any contract with me other than on a week to week basis was confined to the period from January 9, 1922, to the end of that year."

As the contract for 1922 was a contract for a year, and at the end of the year the parties continued under it, as before, the contract for 1923 was also a contract for a year.

[3] It is also impossible to accede to the suggestion that the contract is not one of hiring, but is a contract of sale. The writings which the defendant agreed to furnish to the complainant were "six articles per week." There is nothing in the contract or in the record which shows that the writings or articles which the defendant was to furnish were in existence at the time the contract was signed. On the contrary, the record discloses that what he did was to take the news of the day and make fun of it, in a way that appealed to the reader's sense of humor. In the nature of things it was not possible for the kind of articles he wrote to be prepared in advance. In every sale the seller transfers the property in the goods for a consideration called the price, and in every contract to sell the seller agrees to make the transfer for the consideration agreed upon. In `Mead v. Case, 33 Barb. 202, the Supreme Court of New York had before it an agreement to furnish the defendant a monument to be placed in a cemetery. At the time the agreement was made the stone existed in the general form which the defendant desired. What the plaintiff had to do was to polish it and engrave the necessary inscriptions upon it. The court held that the agreement was not a contract of sale of a monument, but an agreement for the employment of labor and skill. See Parsons v. Loucks, 48 N. Y. 17, 8 Am. Rep. 517; Cooke v. Millard, 65 N. Y. 352, 22 Am. Dec. 619; Hinds v. Kellogg (Com. Pl.) 13 N. Y. Supp. 922, affirmed 133 N. Y. 536, 30 N. E. 1148; Warren Co. v. Holbrook, 118 N. Y. 586, 23 N. E. 908, 16 Am. St. Rep. 788. We think that this was not a contract for a sale of goods, but one for services to be rendered. Moreover, the contract had the further feature that it was to be performed by a particular person.

294 F.—54

[4] The right of a court of equity to enforce by injunction a negative covenant in a contract that the services-contracted for shall not be rendered to another during the contract term, and that in such a case the injunction will issue if the services are unique, and cannot readily be obtained from others, is not an open question in this court. It is foreclosed by our previous decisions. Shubert Theatrical Co. v. Rath (C. C. A.) 271 Fed. 827, 20 A. L. R. 846; Winter Garden Co. v. Smith (C. C. A.) 282 Fed. 166. And see McCaull v. Braham (C. C.) 16 Fed. 37; Keith v. Kellermann (C. C.) 169 Fed. 196; Comstock v. Lopokowa (C. C.) 190 Fed. 599. We think the principle is equally well settled in the courts of New York. See Duff v. Russell (Super. Ct.) 14 N. Y. Supp. 134, affirmed 133 N. Y. 678, 31 N. E. 622; Carter v. Ferguson, 58 Hun (N. Y.) 569, 12 N. Y. Supp. 580; Daly v. Smith, 49 How. Pr. (N. Y.) 150; Metropolitan Exhibition Co. v. Ward (Sup.) 9 N. Y. Supp. 779; Shubert v. Angeles, 88 App. Div. 625, 80 N. Y. Supp. 146; Hayes v. Willio, 11 Abb. Pr. N. S. (N. Y.) 167, 176; Dockstader v. Reed, 121 App. Div. 846, 106 N. Y. Supp. 795; Hammerstein v. Mann, 137 App. Div. 580, 122 N. Y. Supp. 276. And in Shubert Theatrical Co. v. Gallagher, 206 App. Div. 514, 201 N. Y. Supp. 577, decided by the Appellate Division of the Supreme Court, it was recently held that, when an actor's services are of a special, unique, and unusual quality, he may be enjoined from violating his contract of service by performing for others than the one with whom he had previously engaged. In that case the court sustained the right of the plaintiffs to an injunction restraining the defendants from rendering their services elsewhere than with the plaintiff company.

[5] We come now to inquire whether the defendant was a man of such talent, and the character of his services were so unique, as to entitle the complainant to the injunction pendente lite. Mr. Victor M. Lawson, one of the best known of the newspaper men of the United States, editor of the Chicago Daily News, and one of the directors of the complainant, states in his affidavit that he has known the defendant's work for the last several years, during which he has furnished the Associated Newspapers "a daily humorous article of distinctive character, and of high grade as a humorous feature." He adds that he considers his "work as of unusual character, and of special value as a popular newspaper feature." The editor of the Cincinnati Times-Star states that he regards the defendant's work as "unusual in character"; that it has built up "a large local following, and it would be difficult, if not impossible, for us to replace it." The managing editor of the New York Herald states that in his judgment the defendant's work—

"is distinctive and unique, and was known to be such among newspaper people and among the reading public, prior to January 1, 1922, and had a distinctive following prior to that date. I know of no newspaper writer whose work resembles his, nor do I know of any such who could duplicate his work, or provide a substitute for it."

Mr. H. H. McClure, the general manager of the Associated Newspapers, the complainant, an experienced newspaper syndicate man, in his affidavit says:

"I give it as my best expert judgment that Phillips is exceptional, and that his articles are unusual and extraordinary. Moreover, I consider his work as better adapted to being syndicated than that of any other columnist now writing in the American press, for the reason that he has a general human interest appeal, which is so necessary where syndicated matter is to be published in all sorts of papers, and go to readers of all kinds and sorts. Furthermore, almost every other columnist relies to a considerable extent on local allusions, whereas the work of Phillips is of general interest."

There are other affidavits of like import in the record.

The defendant sought to weaken the complainant's case by introducing affidavits to show that some of those who expressed the opinion of the unique character of the defendant's articles made a somewhat limited use of them in their respective papers. This was met in some cases by surrebuttal affidavits, explaining the reasons why this was done. Without reviewing these in detail, it must suffice to say that we have examined with care the affidavits submitted by the defendant, and in our opinion they do not satisfy us that the assertions made in the affidavits submitted on the complainant's behalf are untruthful and unworthy of credence.

[6] This brings us to the option given to the complainant by the defendant. It appears that the contract between these parties was for the exclusive use by the complainant of defendant's newspaper work outside of New York City during the year 1922, and that, if the New York Globe ceased to pay the defendant $250 a week on its account during that year, the complaint was to have the *option* on his exclusive newspaper work at the rate of $225 per week. It was also agreed that defendant granted to complainant "a similar option for the years 1923 and 1924." As the contract was in force in 1923 by virtue of the defendant's holding over, as already set forth, the option was in full force and effect in 1923, when complainant notified the defendant that it availed itself of the option. See Brighton v. Claflin, 180 N. Y. 76, 80, 72 N. E. 920.

The defendant had continued to furnish his articles to the Globe for its use in New York City in accordance with his contract up to June 2, 1923, and his articles were furnished to complainant for its syndicate service outside of New York up to that time, and he was paid by complainant up to that day. And on June 1, 1923, the complainant sent a letter to the defendant, in which, among other things, it said:

" * * * When you made your arrangements late last year with the Globe relative to 1923, it was clearly understood that the exclusive rights to your newspaper work outside of New York City on the part of the Associated Newspapers were to continue. * * * The best evidence that there was a complete mutual understanding between yourself and the Associated Newspapers on this point is the fact that you have supplied to us the six articles per week called for by our contract, and that to your knowledge they have formed a part of our service outside the city of New York, and that we have paid and you have received the stipulated sum of $75 a week. We must therefore in our own protection, deny your right to dispose of your articles for use outside of New York City, and we hereby demand that you refrain from providing articles for such use, or permitting the articles that you write to be so used.

"2. By the contract of January 9, 1922, above referred to, the Associated Newspapers was also given the option on your exclusive newspaper work at the rate of $225 per week at any time that you were no longer receiving $250 a

week from the Globe. I do not understand that the Globe has declined to continue its present arrangement with you. My information is that you have seen fit to contract with the New York World, without the consent of the Globe and in disregard of your contract relations with them. The Associated Newspapers therefore claims, and it hereby exercises the option on, your exclusive newspaper work, inside as well as outside the city of New York, at the rate of $225 per week for the balance of 1923 and 1924."

It also appears that the Globe ceased to pay the defendant anything after June 2, 1923, and that complainant promptly notified the defendant that it exercised its optional right to its exclusive use of his newspaper work both inside and outside of New York City. It appears, from what has been said, that the complainant had a contract with the defendant which entitled it to his exclusive newspaper work inside as well as outside of the city of New York on and after the exercise of complainant's option from June 2, 1923, through the year 1924. Notwithstanding the existence of this contract the defendant saw fit to enter into a contract with one of the newspapers of the city of New York to render services to it which are in disregard of his contract relations with the complainant. It can make no difference that he did this, believing in good faith that he was not violating his legal obligations. And as we think his services as a writer of humorous newspaper articles are shown by the evidence to be unique and unusual, and that an action at law to recover damages for the breach of his contract would afford an inadequate remedy, the case is one in which the remedy by injunction is proper and alone adequate, and it was not error to restrain the defendant from doing what he had engaged not to do.

Judge HOUGH heard the argument, and at its close concurred with us in the conclusion for affirmance, but because of necessary absence has not seen the opinion as prepared.

Order affirmed.

⬤⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 44 Sup. Ct. 331, 68 L. Ed. —.