**MADISON SQUARE GARDEN CORPORA-
TION v. BRADDOCK.**

No. 6476.

Circuit Court of Appeals, Third Circuit.
June 10, 1937.
Rehearing Denied June 18, 1937.

BUFFINGTON, Circuit Judge, dissenting.

McDermott, Enright & Carpenter, of Jersey City, N. J. (George W. Whiteside and Francis Shunk Brown, both of Philadelphia, Pa., and James D. Carpenter, Jr., of Jersey City, N. J., of counsel), for appellant.

Samuel B. Gould and Merritt Lane, both of Newark, N. J., for appellee.

Before BUFFINGTON, THOMPSON, and BIGGS, Circuit Judges.

BIGGS, Circuit Judge.

Upon April 10, 1935, Madison Square Garden Corporation (hereafter referred to

as the Garden) entered into a contract with James J. Braddock which provided for a contest with Max Baer, then holder of the title of heavyweight champion of the world, and further provided in paragraph 10 of the contract as follows:

"That in the event Braddock is the winner of the boxing contest between him and the said Max Baer and Braddock shall become the heavyweight champion of the world, then the Garden shall employ Braddock and Braddock agrees that he will render services as a boxer in his first boxing contest thereafter (which contest shall be for the heavyweight championship of the world). Such contest shall be held in the United States of America under the auspices of the Garden, not later than September 30, 1936, with an opponent to be mutually agreed upon. * * *"

Paragraph 11 of the contract provided:

"That Braddock shall not, prior to the contest referred to in paragraph 10 hereof, engage in any boxing contest or boxing exhibition, without the written consent of the Garden, except boxing exhibitions for not more than four (4) rounds and in which no decision is rendered. Such exhibition contests may be held under the auspices of others than the Garden."

Upon July 28, 1936, within the time provided by the contract of April 10, 1935, the Garden notified Braddock that he was to fight Max Schmeling at Madison Square Garden Bowl, in the city of New York, upon the evening of September 30, 1936, and upon the following day Braddock's manager advised the Garden that the selection of Braddock's opponent, the date and place of meeting, were acceptable to Braddock. Thereafter, on August 12, 1936, it became apparent that Braddock had suffered a severe injury to his left hand which would render it impossible for him to engage in the fight with Schmeling upon September 30, 1936.

On August 21, 1936, Braddock and the Garden entered into a contract (Exhibit "C" of the record) wherein and whereby he contracted to fight Schmeling under the auspices of the Garden, the match to be held on either the 3d or the 10th day of June, 1937. This contract, to which Braddock was the party of the second part, provided, inter alia, as follows:

"The party of the second part hereby agrees to deposit with the party of the first part, cash, certified check, or accepted draft for the sum of $10,000 as forfeit money, to guarantee his appearance, his making the weight as above agreed, and for his performance of this contract in all other respects.

"If said party of the second part shall fail to appear or make the weight agreed upon, or if said party is not in physical condition and should fail to pass the required examination by a duly licensed Physician, then said forfeit money may, at the discretion of the Athletic Commission, be forfeited to the party of the first part (the Garden), and under these circumstances the party of the first part will pay to Max Schmeling, the other contestant in this match, or his duly authorized manager, the sum of $5,000. as liquidated damages. If for any reason, other than the failure on the part of either of the two contestants to appear, the party of the first part does not fulfill this contract, the party of the first part shall then pay to the party of the second part an amount equal to said forfeit as liquidated damages, unless this match is cancelled by mutual consent."

A further paragraph of this contract provided:

"It is further agreed that if said party of the second part enters into another contest prior to the one herein contracted for and is defeated or in any other way does anything calculated to lessen his present value as an attraction, the party of the first part shall have the option to rescind and cancel this contract without further liability hereunder, provided such cancellation is approved by the New York State Athletic Commission."

Upon December 12, 1936, a further contract (Exhibit "E" of the record) was entered into between Braddock and the Garden in which the date of the proposed contest with Schmeling was definitely fixed for June 3, 1937, Braddock's percentages of payment in the terms of "the gross receipts of the house" were more than doubled, but the other provisions of the contract were substantially the same as those contained in the contract of August 21, 1936, except for one further provision thereof added after the witnessing clause, as follows:

"It is understood that you (meaning Braddock) cannot participate in any bout with Joe Louis until after June 3, 1937."

The contracts entered into by Braddock and the Garden for the contest with Schmeling provide:

"It is understood and agreed that said contest shall be with gloves as provided in section 12, chapter 714 of the Laws of 1921, or any amendment thereto [Unconsol.Laws, § 203], and to be furnished by the party of the first part, and shall be conducted in all respects in conformity with the Laws of the State of New York and the Rules and Regulations adopted by the Athletic Commission of said State, which are hereby made a part of this agreement. * * *"

Section 193, Unconsol.Laws, chapter 912, section 3, Laws 1920, as amended, of the state of New York provides in part as follows:

"The commission shall have and hereby is vested with the sole direction, management, control and jurisdiction over all such boxing, sparring and wrestling matches or exhibitions, professional as well as amateur, to be conducted, held or given within the state of New York, and no such professional and/or amateur boxing, sparring or wrestling matches or exhibitions shall be conducted, held or given within the state except in accordance with the provisions of this act."

In the early part of December, 1936, rumors reached the Garden that Braddock was contemplating a breach of his contract to fight Schmeling upon June 3, 1937, and engage in a contest with Joe Louis. Upon December 12, 1936, the New York State Athletic Commission held a meeting in which the commission forbade Braddock from engaging in a bout of any length whatsoever against Joe Louis before he had defended his title against Schmeling. The commission was acting within its powers in making such order and thereby reiterating its support of the contracts entered into by Braddock for the Schmeling bout. The action of the commission must have made plain to Braddock that by entering into a contract to fight Louis, he would breach his contract with the Garden, but in our opinion, the action referred to, of the New York State Athletic Commission, has no effect upon the question of the enforcement of the negative covenant alleged to exist in the agreement between Braddock and the Garden, and we therefore will make no further reference to the action of the commission.

[1-4] In the month of February, 1937, Braddock entered into a contract to fight Joe Louis in a fifteen-round boxing contest to a decision, this contest to be held in Chicago, Ill., on June 22, 1937. Now it is the contention of the Garden that Braddock, by entering into this contract to fight Louis, expressly repudiated his contract to meet Schmeling upon June 3, 1937, under the auspices of the Garden, but whether or not there was express repudiation is unimportant in our view. There was practical repudiation for the reason that a heavyweight boxer, through sheer physical limitations, cannot engage in two major contests involving the title of World's Heavyweight Champion within nineteen days. Neither can there be any doubt that Braddock now stands in breach of his contracts to fight Schmeling under the auspices of the Garden. This, however, is not the question before us. The question before us is whether or not, within any of the contracts entered into between Braddock and the Garden, a negative covenant exists which this court may enforce within the doctrines of law originally laid down in the cases of Lumley v. Wagner, 1 DeGex, M. & G. 604, and Lumley v. Gye, 2 El. & Bl. 216, as interpreted by our own courts. We are forced reluctantly to the conclusion that no such enforceable negative covenant is now in effect. A negative covenant is contained in paragraph 11 of the contract of April 10, 1935, but this covenant, by its express language, referring to paragraph 10, prohibits Braddock from engaging in boxing contests only until he has fought a selected opponent, to be mutually agreed upon by the Garden and himself, but that the contest with the selected opponent is to take place no later than September 30, 1936. It is the contention of the appellant that this negative covenant, despite the limitation of time referred to, is none the less carried over by necessary implication into the subsequent contracts between Braddock and the Garden. We cannot find this to be the case. The enforcement of negative covenants in contracts of personal service is based squarely upon the theory that the defendant's services are unique and extraordinary and therefore cannot be compensated for in money damages. Lumley v. Wagner, supra; Lumley v. Gye, supra; Keith v. Kellermann (C.C.) 169 F. 196; Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227, 90 Am.St.Rep. 627. The language of the contracts between Braddock and the Garden, following the original agreement of April 10, 1935, is en-

tirely inconsistent with this well-established rule of law upon which rests the enforcement of all negative covenants. These subsequent contracts provide for the posting of a substantial fund by Braddock to be forfeited if he fails to appear, for liquidated damages by way of the division of that forfeit, and provide further that if Braddock engages in any contest wherein he is defeated so that his value as an attraction is impaired, the Garden, with the permission of the Athletic Commission, may rescind and cancel the contracts of his employment, so that, if such cancellation took place the Garden would be under no obligation to Braddock to hold a boxing contest in which Braddock is to be employed as a contestant. The recited provisions destroy the contention of the appellant. Each of the later contracts is complete unto itself and each stands alone.

■ The final paragraph of the contract of December 12, 1936, as heretofore set out, does contain language prohibiting Braddock from fighting Louis until after June 3, 1937. But this provision, by its limitation of date, obviously is of no assistance to the appellant in the suit at bar.

In view of the foregoing, we must answer our question in the negative. Veritably, at this time there is no negative covenant in existence.

■ Assuming otherwise, however, and that the covenant in question was carried into the subsequent contracts with legal effect, none the less it could not be enforced. It is settled law both in the United States and in England that there must be mutuality of remedy between parties to a contract before a negative covenant against one of them will be enforced. This doctrine of mutuality of remedy is a very simple one. It simply means that unless a right be given under the contract whereby the party not in breach may be compelled to perform his obligations, then the party in breach will not be subjected to injunction under the negative covenant. To do so would be to subject that party to undue hardship. This principle was fully expressed in Rutland Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L.Ed. 955, in which Mr. Justice Strong stated:

"And it is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of

enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former. Fry on Specific Performance, § 286."

No further authority need be quoted.

■ Braddock cannot at this time compel the Garden to make use of his services as a boxer because the obligations of the Garden to Braddock expired upon June 3, 1937, by the terms of his last contract of employment. There is therefore no mutuality of remedy and therefore this court, even assuming the existence of a negative covenant, could not as a matter of law enjoin Braddock from engaging in the contest with Louis upon June 22, 1937, or in any other boxing contest.

■ It has been well stated that upon an application for a preliminary injunction to doubt is to deny. Upon this record we are clear that the negative covenant cannot be enforced as a matter of law and therefore it is all the more apparent that the learned trial judge was correct in his decision to deny the preliminary injunction which the appellant seeks. Lare v. Harper & Brothers (C.C.A.) 86 F. 481; Miller v. Morley Finishing Mach. Co. (C.C.A.) 87 F. 621.

The decision of the court below is affirmed.

BUFFINGTON, · Circuit Judge (dissenting).

The basic question involved in this case is whether at the time this injunction bill was filed Braddock was under contract not to fight his now proposed heavyweight championship fight with Louis at Chicago on June 22d. The determination of that question depends on the meaning, force, and effect of written agreements signed by Braddock and the Madison Square Garden, the plaintiff.

Now, certain elements aid in ascertaining what written agreements mean. A celebrated British Judge said: "Tell me what the parties have done and I will tell you what their writing means." So also the object the parties had in view when they signed the writing is a key to its meaning.

What Braddock had in view is tellingly expressed by him in his own words: "I will not fight again until June, 1936. Then I will stake my all against the foremost contender under the auspices of Madison Square Garden. I believe in loyalty.

928

* * * The Garden took me off the bread line by giving me three fights and then the Baer engagement. Naturally I will stick to the Garden."

Applying this commendable purpose to the facts of the case, it appears that Braddock was a professional boxer. He was nationally unknown. Madison Square Garden took him up and secured for him a contest with Baer, a world's heavyweight fighter, and on April 10th, 1935, entered into a written contract, which I term the basic contract, the pregnant provisions of which are as follows:

"That the Garden agrees to conduct and hold or cause to be conducted and held, and Braddock agrees to render his services as boxer in a fifteen round boxing contest with Max Baer for the Heavyweight Championship of the world, on or before the 30th day of June, 1935."

That contest resulted in Braddock defeating Baer and himself becoming a world's champion heavyweight. This initial victory provided for the subsequent action of the parties in arranging details for, as stated therein, Braddock's "first boxing contest thereafter, which contest shall be for the heavyweight championship of the world." The provision was as follows:

"In the event Braddock is the winner of the boxing contest between him and the said Max Baer and Braddock shall become the Heavyweight Champion of the World, then the Garden shall employ Braddock and Braddock agrees that he will render services as a boxer in his first boxing contest thereafter (which contest shall be for the Heavyweight Championship of the World). Such contest shall be held in the United States of America under the auspices of the Garden, not later than September 30,. 1936 with an opponent to be mutually agreed upon. In the event that the parties hereto cannot agree upon Braddock's opponent for such contest, then and in that event such opponent shall be designated by the New York State Athletic Commission. The time and place for such contest shall be designated by the Garden. The Garden shall give Braddock not less than sixty (60) days prior written notice of the time, place and opponent designated for such contest. Braddock shall be paid for his services in such contest, a sum equal to (a) forty-two and one-half per cent (42½%) of the gross receipts from tickets sold, less Federal, State and/or Municipal admission taxes (if any) and compensation for ring officials,

and (b) forty-two and one-half per cent (42½%) of the amount or amounts received by the Garden upon the sale or other disposition of motion pictures, sound or television pictures and radio or television broadcast rights, for such contest."

In pursuance of its agreement to give "not less than sixty (60) days prior written notice of the time, place and opponent designated for such contest," Garden selected Max Schmeling as Braddock's opponent, and the contest which was set for September 30, 1936, having been postponed to June 3, 1937, on account of an injury to Braddock's hand, Garden and Braddock, on August 21, 1936, signed an agreement for the June, 1937, fight at Garden's·club house between Braddock and Schmeling, which, as the agreement provides, "shall be conducted in all respects in conformity with * * * the rules and regulations adopted by the Athletic Commission of the State, which are hereby made a part of this agreement."

On August 21, 1936, Garden and Schmeling entered into a contract of the same import and in which the latter agreed to fight Braddock at the same time and place.

It further appears that on December 12, 1936, Garden and Braddock entered into an additional contract which recited the foregoing agreements between them, and stipulated that "If said party of the second part enters into another contest prior to the one herein contracted for and is defeated, or in any other way does anything calculated to lessen his present value as an attraction, the party of the first part shall have the option to rescind and cancel this contract without further liability hereunder, provided such cancellation is approved by the New York State Athletic Commission," and which contains this significant and restrictive stipulation:

"It is understood that you cannot participate in any bout with Joe Louis until after June 3rd, 1937."

From the foregoing facts and writings, it is clear that the basic contract, so far as the time, place, and agreement of Braddock to fight are concerned, has not been canceled by the subsequent agreements and the same is still in force. That agreement bound Braddock to do two things, first, to take part in the June contest at Madison's club. In that regard Braddock states in court, by counsel, he will not do so. The

other is his restrictive agreement not to enter into any contest before he fights Schmeling, or to use his own restrictive words, "It is understood that you cannot participate in any bout with Joe Louis until after June 3, 1937." This violation of his contract and of the plaintiff's contract rights would ensue if he fights, as he proposes to do, at Chicago. It is also to be noted that all parties concerned appeared before the New York Athletic Commission on December 12, 1936, and, after hearing, that body held:

"The Commission forbids Braddock from engaging in a bout of any length whatsoever against Joe Louis before he defends his title against Schmeling."

It is now contended that this court of equity is powerless to prevent any such violation of the plaintiff's contract rights. I cannot agree with such contention. Finding as I do that every element of equity and fair dealing is with the plaintiff and that the defendant's contract-breaking conduct is unjust, that there is no equity on his part, and that he comes into this court in the position of lawlessness and unclean hands, this court is justified in reversing the court below and remanding the record with instructions to enter an injunction restraining the defendant from this violation of plaintiff's contract rights and his corresponding legal obligation and duty.

Moreover, it is apparent that Braddock contracted for services personal and unique; that he is preventing Garden from carrying out its contract with Schmeling —a contract the making of which was with Braddock's approval; that apart from all questions of money damage, Braddock is undermining and lessening the established good will of Garden in destroying its ability to promote worthy sports and manly contests, and that the destruction of Garden's good will cannot be estimated in money damages; that Braddock's continuing to be seduced from the path of contract duty by sordid money making promoters, has made it, and will make it, impossible for ball players, boxers, artists, authors, singers, and movie folk and other persons rendering unique and personal service, to enlist the needed aid of helpful promoters, if Braddock's contract is but a scrap of paper and binds no one but the promoter.

In so holding, I find myself in accord with justifying authorities: Keith v. Kellermann (C.C.) 169 F. 196; Shubert Theatrical Co. v. Rath (C.C.A.) 271 F. 827, 20 A.L.R. 846; Associated Newspapers v. Phillips (C.C.A.) 294 F. 845; Madison Square Garden Corp. v. Carnera (C.C.A.) 52 F.(2d) 47, and cases cited.