**FRASER SWEATMAN, INC., a New York corporation**

v.

**Peter SCHREIBER, a citizen or a subject of the foreign state of West Germany.**

Civ. A. No. 68–1565.

United States District Court
E. D. Pennsylvania.

Sept. 30, 1968.

Ballard, Spahr, Andrews & Ingersoll, M. Carton Dittmann, Jr., Philadelphia, Pa., for plaintiff.

I. Jerome Stern, Robert J. Stern, Philadelphia, Pa., for defendant; Stern & Stern, Philadelphia, Pa., Samuel A. Litzenberger, William L. Goldman, of counsel.

## OPINION

KRAFT, District Judge.

Plaintiff, a New York corporation, has brought this action for the alleged breach of an employment contract[1] by

I.
FRASER SWEATMAN INC
290 Bird Avenue,
Buffalo 13, N.Y.

June 1, 1966.

To Mr. Peter Schreiber,
Dear Mr. Schreiber:

This letter is to confirm our verbal agreement with you concerning your employment by us. If it is in accordance with your understanding of the agreement then please sign the copy which we have attached where indicated and return the copy to us.

We have agreed as follows:

1. Your employment with us shall commence upon such date as we shall mutually agree upon but in any event not later than the 31st of December, 1966.

2. You shall be employed at Hatfield, Pennsylvania or at such other places as we may from time to time designate.

3. The term of our agreement with you shall be for five (5) years from the date you commence your employment with our Company.

4. So long as you are in our employ and able to fulfill your responsibilities you will be entitled to an annual salary of not-less than $15,000 payable monthly.

5. You shall be entitled to four (4) weeks holiday each year during your employment at a time or times to be fixed by us.

6. You shall be responsible for the research and development activities carried on by our Company and for such managerial functions as we may require. You shall report to the President of our Company, Mr. Fraser Sweatman, through the General Manager of our Company who at the present time is Mr. Gary Porter.

7. We shall pay all reasonable costs of moving you and your family and household effects from Germany to Hatfield.

8. We have agreed to assist you in financing a house in Hatfield and as of the date of this letter we have satisfied this obligation to you.

9. We understand that you are now the inventor and/or owner of certain letters patent of invention, and we acknowledge that we have not acquired any right, title or interest with respect to such letters patent of invention by virtue of our agreement with you as to your employment.

10. During your employment you shall devote your full time and skill for the benefit of our Company, and we shall be entitled to the ownership of all inventions, designs, improvements and discoveries and letters patent of invention in connection therewith, which are invented, designed, or discovered by you while you are employed by us. You have agreed to promptly inform us of such inventions, designs, improvements and discoveries and to execute all documents which may be required to prepare, prosecute and enforce letters patent with respect thereto.

11. Upon the completion of a period of one (1) year from the date of the termination of your employment with us we will grant to you or in the alternative to any single manufacturer designated by you an irrevocable paid-up non-exclusive license in a form to be approved by our counsel, to engage in the manufacture and sale of any inventions, designs, improvements or discoveries which have been invented, designed or discovered by you and in respect to which in the opinion of our counsel we have the right to grant such licences, provided that prior to the expiration of such period of one (1) year following the termination of your employment with us we shall not have decided and taken active steps to manufacture and sell or to licence others to manufacture and sell such inventions, designs, improvements or discoveries.

12. It is understood and agreed that our agreement with you shall be interpreted in accordance with the laws of the State of New York.

Yours sincerely,
FRASER SWEATMAN INC.,
Per: ___Fraser Sweatman___

I hereby confirm that the foregoing correctly sets out the terms of my agreement with Fraser Sweatman Inc. concerning my employment with that Company. DATED this 30 day of Juni, 1966
___Peter Schreiber___
Peter Schreiber

defendant, whom plaintiff seeks to enjoin preliminarily by the motion now before us. The issue presented is whether the defendant, a citizen of West Germany, shall be restrained from competing with the plaintiff during the unexpired term of the five-year contract. The contract involved contains no *express* promise to refrain from competing, but the plaintiff contends: "It is axiomatic that an employment contract, such as defendant Schreiber's *impliedly* contains a promise not to compete." (emphasis ours).

■ We do not share the plaintiff's certainty in this regard. Plaintiff still has the burden of proving that such a negative covenant arises by necessary implication from a consideration of the language of the entire contract in light of the surrounding circumstances or from other manifestations of intention.[2]

Plaintiff, since 1953, has been engaged in the design, manufacture and distribution of anesthesia apparatus and *related equipment throughout the United* States. Its yearly net sales are approximately $1,000,000.

Sometime in 1965, plaintiff became aware of defendant's skill and talent as a design engineer. At that time defendant was employed as a design engineer by Dragerwerk in Lubeck, West Germany. He had been so employed in the design of anesthetic equipment for about ten years and had written a book (then unpublished[3]), which described from an engineer's viewpoint the various design principles involved in the designing of anesthetic equipment.[4]

Defendant holds no university or college degrees in engineering or mathematics, but he is a tool maker and holds certificates from several engineering schools in Germany.

At the end of 1965 plaintiff, through its president, Fraser Sweatman, offered defendant a position with the plaintiff corporation in the United States. Plaintiff arranged, at its expense, for defendant and his wife to visit the United States before he made his decision. After further negotiations defendant and plaintiff agreed upon the terms of an employment contract[5] which were reduced to writing. (Ex. P-1)

Defendant's contract with Dragerwerk required him to give six-months notice of termination and contained a two-year non-competitive clause.[6] Fraser Sweatman and defendant successfully negotiated plaintiff's release from these restrictive provisions and defendant signed his five-year contract with plaintiff on June 30, 1966. Defendant began his employment thereunder on July 1, 1966 and continued until April 26, 1968, when he submitted his resignation effective April 30, 1968.

In consideration and as part of the contract, plaintiff paid the defendant's moving expenses from Germany and assisted defendant in obtaining an immigration visa to the United States. It also aided him in securing medical treatment for his wife, as well as in the necessary financing for a residence in Doylestown, Pennsylvania.

2. Comment (1) (a) § 380 Restatement of Contracts "Enforcement of Negative Duties That Accompany Affirmative Promises."

3. The record indicates that the book has since been published with 2,000 copies in print.

4. Defendant also developed 14 patents in his ten years, which were assigned to Dragerwerk.

5. Fraser Sweatman drafted the letter contract.

6. Plaintiff did not include a non-competition clause in the instant contract, because Fraser Sweatman did not see the need for it in a five-year contract.

In his position with plaintiff, Schreiber served as design engineer and production manager. He was responsible for designing, prototyping,[7] field testing, developing and modifying various anesthesia devices manufactured and/or sold by the plaintiff. Defendant also attended many medical meetings and conventions, where he was introduced to plaintiff's customers. He obtained a knowledge of plaintiff's suppliers and methods of manufacturing. He exhibited an ability to initiate and manage four or five design projects concurrently.

In the course of his employment, defendant became dissatisfied with the working and sanitary conditions in plaintiff's plant. He became concerned, too, about safety problems involved in the design of the equipment manufactured and sold by plaintiff. He made these problems known to Fraser Sweatman, who did not remedy them to defendant's satisfaction.

In November and December 1967, in the course of several discussions, Sweatman advised defendant that he intended to sell the production of anesthesia equipment to another company. This information disturbed defendant, because he is primarily a designer of anesthesia devices.

In November 1967, defendant informed Sweatman that he had received an offer from Drager in Germany which he did not then take seriously. However, as conditions in the plaintiff's plant failed to improve, defendant made known to plaintiff's general manager that he intended seriously to consider the offer from Drager.

On March 31, 1968, at a meeting in Schreiber's home in Hatfield, defendant informed Sweatman of the possibility of his employment with Drager in the deep sea diving field, and that he would also represent the Drager Medical line in competition with plaintiff in some limited aspects of the anesthesia device market in the United States. Sweatman expressed a willingness to release Schreiber from his contract, provided he would aid in the training of a replacement. On or about April 17, 1968, with the knowledge and permission of Sweatman, defendant went to West Germany to discuss the aforesaid offer with Drager.

Following his return to the United States, defendant consulted an attorney and then prepared and forwarded a letter of resignation[8], dated April 26, 1968, to Sweatman. In this letter defendant referred to the Drager offer and offered to make himself available to Sweatman on a consultant basis and to assist in the training of a replacement. He further stated that his decision was "irrevocable" and "effective April 30, 1968."

---

7. Prototyping is the building of a working model of a machine.

8.                          Doylestown,
                            April, 26, 1968
Peter Schreiber         16 Walnut Lane
Mr. Fraser Sweatman
16 Ardmore Road
Toronto 10
Canada
Dear Fraser:

In our conversation on March 31, 1968, I indicated to you that my future plans would probably be changed drastically, with the possibility of my becoming associated with the Drager Company.

Matters have progressed much more rapidly than I anticipated, and I am herewith submitting my resignation, effective April 30, 1968. I expect my schedule will permit me to assist training a replacement for my position, and I can be available on a consultant basis in the future, the pay to be determined from time to time, on either a per diem or per job basis.

I have had a pleasant association with you and I trust that this friendly relationship will continue in the future. I hope that you will not have any difficulty in making the transition because of this decision that I have made.

My decision is irrevocable and I will be moving from your premises in Hatfield as soon as possible.

                   Very truly yours,
                   Peter Schreiber

Upon receipt of this correspondence, Sweatman, on May 3, 1968, replied by mail to Schreiber, as follows:

"F
S    FRASER SWEATMAN (CANADA) LIMITED
Formerly Canam Surgical Services Ltd.
77 Grenville Street, Toronto 5, Ontario
Area  416–4448
925–4440

Mr. Peter Schreiber,                    May 3, 1968
16 Walnut Lane,
Doylestown, Pa.

Dear Peter:

My apology for not getting your cheque out earlier but your precipitous resignation took me by surprise and I have been not only away but extremely busy, as you can imagine under the circumstances.

As is customary, I have asked Margaret to deduct your travelling expense from your present salary cheque, but, of course, when you submit your final expense report any differences will be made up to you.

I would like to make some arrangements with you to clean up some of the unfinished work, although I hardly know what to suggest to you in the way of remuneration for the time that you would be using on some of these matters. The Celog 11 is of prime importance, and there are some other matters to be considered as well but this would keep you pretty busy I imagine for the next short period.

You will recall at my meeting in your home that we discussed the possibility of your going through slowly and carefully the four or five major points of your book.

I have hired Mr. Ed Connolly, who was with the Foregger Company for the past ten years, and I believe he will be joining the Company either Monday, May 6th, or the following Monday, depending on his completion of some of his tasks with Foregger.

I think I also mentioned to you that Alan Bickford, who has a degree in Physics, had agreed to give me some personal assistance because of past favours that I have done for him.

I would like Alan and Ed to have a chance to sit down with you for perhaps an evening and you could teach them the fundamentals, which you assured me you would do.

I expect to be in Toronto most of the week of May 6th and if you would be good enough to telephone me, at your convenience, we can perhaps make a date for a weekend since Alan, as you know, works at Scott Aviation.

If we can make some suitable arrangements in this regard I would be very grateful.

I look forward to word from you.

Kindest personal regards.

Yours sincerely,
Fraser
Per Margaret
Fraser Sweatman

FS:JS                                                  "
Encl.

Thereafter, defendant called Sweatman twice without success, and finally requested Mr. Rogers, the sales manager of plaintiff, to ask Sweatman to contact him regarding the completion of the design projects.

Defendant, along with a Mr. Landes and Mr. Boerner (also former employees of plaintiff) on May 16, 1968, formed a new company, NAD, Inc. (North American Draeger). Schreiber is president, Boerner, vice president, and Landes, secretary-treasurer. The three are the sole directors of the company.

The new company manufactures rough parts for the anesthesia machines such as the stand and casting. Drager of West Germany supplies the remaining high quality parts. NAD, Inc. is now engaged in manufacturing and selling small veterinary animal anesthesia machines, and acts, as well, as a distributor for the whole medical line of Drager equipment. An exclusive distributorship was given by Drager to NAD, Inc. for some minor products and for the production of deep sea diving and ocean research equipment in the United States.

Shortly after its incorporation, NAD, Inc. produced and displayed large and small animal anesthesia machines at the American Veterinary Meeting held in Boston during the week of July 23, 1968.

Drager of West Germany has an agreement with NAD, Inc. by which Drager has the right, to be exercised within six years, to buy more than 51 percent of the stock of the new company. Drager also advanced funds as a personal loan to defendant to purchase machinery for the new enterprise.

Plaintiff claims that it will suffer irreparable harm, because it will be deprived of the ownership of designs, inventions, improvements and letters patent which defendant, by reason of his unique and unusual services, would have designed, invented or discovered during the remainder of his contract and that defendant will compete with the plaintiff by exercising such unique services for the benefit of NAD, Inc.

Since the instant contract is devoid of an express covenant not to compete, the plaintiff seeks to imply such a covenant by relying upon the language of paragraph 10 of the contract which states: "During your employment you shall devote your full time and skill for the benefit of our company * * *".

■ We are constrained to find that such a provision merely requires what is normally expected in any employment relation, namely, that an employee, *while so employed,* will perform his assigned tasks to the best of his ability and for the benefit of his employer. A clause of this type does not, per se, preclude or restrict an employee, who terminates that relationship, from engaging in competition with his employer thereafter.

■ Implied covenants are not favored in the law. 17A C.J.S. Contracts § 328, B. Implied Terms. "Courts are even less disposed to sustain an agreement which forms part of a contract of employment to refrain from subsequently engaging in a competitive occupation than where a similar agreement is attached to a bill of sale. 5 Williston, Contracts § 1643, pp. 4606–4607 (Rev. Ed. 1937). *Where there is no restrictive provision at all, we will not imply one.*" Denawetz v. Milch, 407 Pa. 115, 121, 178 A.2d 701, 704 (1962) (emphasis ours)

■ Before defendant was hired by the plaintiff he was bound by an *express* negative covenant not to compete with Drager for two years. This restriction was avoided by successful negotiation by Sweatman and defendant with Drager. After termination of the Drager contract, Sweatman, though fully aware of it restrictive provisions, saw fit to omit any restrictive covenant from the contract which he drafted. This fact, we think, militates strongly against an implication of a covenant not to compete. Surely, had Sweatman freely assented to the termination by defendant, plaintiff could not now contend that the contract as written precluded competition by defendant thereafter.

In this regard, the meetings and letters exchanged between defendant and Sweatman concerning defendant's resignation persuade us to find that Sweatman did, in fact, acquiesce in the termination of defendant's contract with plaintiff.

Finally, we find that defendant's services were not so unique and extraordinary as to be irreplaceable. The ease with which plaintiff recruited a replacement, who had a comparable, although not as brilliant, ten year background in the same field, impels us to doubt the severity which plaintiff now attributes to loss of defendant's services.

In any event "[i]t has been well stated that upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3 Cir. 1937).

This opinion embodies the Court's findings of fact and conclusions of law, in accordance with F.R.Civ.P. 52(a).

### ORDER

Now, this 30 day of Sept., 1968, it is ordered that the motion of Fraser Sweatman, Inc. for a preliminary injunction be, and it is, denied.